CHARLES W. AND DOROTHY F. STEADMAN, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 224–66.   Filed May 22, 1968.

*William F. Snyder*, for the petitioners.
*John P. Graham*, for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency in the income tax of petitioners for the year 1962 in the amount of $67,138.73.

The parties have made concessions which can be given effect in the Rule 50 computation. Two issues remain for decision: (1) Whether 32,000 shares of common shock of Richards Musical Instruments, Inc., held by petitioner became worthless in 1962, and, if so, (2) whether petitioners are entitled to a deduction in 1962 of $80,000, their cost basis in the shares, as an ordinary loss under section 165(a), I.R.C. 1954,[1] or as a capital loss under section 165(g).

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Charles W. Steadman (herein called petitioner) and Dorthy F. Steadman, husband and wife, were residents of Shaker Heights, Ohio, on the date they filed their petition in this proceeding. They filed a joint Federal income tax return for calendar year 1962 with the district director of internal revenue at Cleveland, Ohio.

During 1962, and for a number of years prior thereto, petitioner was an Ohio attorney who was a partner in the Cleveland firm of Marshman, Hornbeck, Hollington, Steadman and McLaughlin. His practice was principally in the field of corporate finance and organization.

Paul E. Richards was advised of petitioner's practice in the corporate law field and, in the spring of 1960, consulted him with regard to a plan for the acquisition and amalgamation of several musical instrument companies into a single manufacturing and merchandising organization which would market a complete line of musical instru-

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

ments, thereby eliminating many of the overhead expenses inherent in the independent operations.

After extensive discussions of these plans, petitioner was offered the position of general counsel to the proposed corporate organization and was assured that he would remain in that capacity so long as Paul Richards maintained control of its management. At that time petitioner estimated, on the basis of Paul Richards' immediate and long range plans for organization and acquisition, a potential of $30,000 to $40,000 a year in legal fees for his work for the organization. Under the partnership arrangement in petitioner's law firm, he would receive all fees from Richards Music after a percentage was subtracted to cover his share of the overhead expenses of the firm.

Petitioner accepted Paul Richard's offer and, as a first step in executing the plan, organized the Richards Music Corp. (herein referred to as Richards Music) as the principal corporate entity. Then, on December 30, 1960, the Blessing Band Instrument Co. was merged into Richards Music, and the stock of the Martin Band Instrument Co. and the assets of the Reynolds Band Instruments Co. were acquired by Richards Music. The resulting entity became operational at this time with petitioner as its secretary, general counsel, and member of the board of directors. In early 1962, the name of Richards Music Corp. was changed to Richards Musical Instruments, Inc.

To finance the merger and acquisition, Richards Music borrowed $750,000 from American Research & Development Corp. of Boston, Mass. (herein referred to as American Research), in exchange for 6-percent convertible subordinate debentures, which were convertible into common stock of Richards Music at $3 per share.

Immediately following the merger and acquisitions, the board of directors of Richards Music consisted of nine members, five (including petitioner) representing the shareholders, three representing American Research, and one representing the Wurlitzer Co. which had acquired notes and debentures of Richards Music in return for the stock of the Martin Band Instrument Co.

By the summer of 1961 it became apparent to the board of directors of Richards Music that the financing obtained through the sale of the convertible debentures was insufficient to complete the plan of acquisition. At that time the 173,200 outstanding shares of the closely held corporation's common stock were owned as follows:

| Name | Number of shares | Name | Number of shares |
|---|---|---|---|
| Paul Richards | 66,000 | Karl Blessing | 27,600 |
| Bessie Richards | 20,000 | Fred Blessing | 27,600 |
| Gilbert Marshner | 18,000 | Charles W. Steadman | 12,000 |
| John Harbison | 1,000 | | 173,200 |
| Frank Konn | 1,000 | | |

At a special meeting of the board of directors on June 30, 1961, American Research and other debenture holders offered to purchase shares of Richards Music common stock (if and when issued) at $2.50 per share in an amount up to $350,000. The offer was conditioned upon the appointment of a 10-member board of directors for Richards Music containing 5 persons selected by the debenture holders. Implicit in this offer was the bid for effective control of the corporation which would inure to American Research by virtue of its veto power on the board of directors and the number of shares of common stock which it owned and controlled through the conversion feature of the debentures.

In response, the board of directors passed a resolution authorizing the issuance of additional shares of common stock at a price of not less than $2.50 per share, the total dollar amount of the issue to be at least $350,000 but not more than $500,000. The resolution provided that the shares be offered first to the shareholders of record at $2.50 per share, then, if the subscriptions by the shareholders were deemed insufficient to meet the financial needs of the company, to the debenture holders at $2.50 per share, and finally to private investors at not less than $2.50 per share.

A vice president of American Research informed petitioner that American Research was considering, in the event its offer to purchase the new issue of Richards Music stock was accepted, the replacement of the management of Richards Music and the concentration of its legal activities in Boston with a firm located there which handled American Research's legal affairs. Petitioner discussed with several of the shareholders and with his law associates the offer made in the board resolution of June 30, 1961. A partner advised him that purchase of Richards Music stock solely as an investment would be "very speculative." Petitioner was concerned, however, that the shareholders equal American Research's offer of $350,000 in subscriptions. After it appeared that other shareholders were willing to subscribe to only 70,000 additional shares, petitioner arranged to finance subscription to the remaining 70,000 shares. At a board of directors meeting of Richards Music on July 20, 1961, oral offers for subscriptions at $2.50 per share of Richards Music common stock, yet to be issued, were made as follows:

| Name | Number of shares |
|---|---|
| Paul E. Richards | 40, 000 |
| Karl Blessing | 20, 000 |
| Fred Blessing | 10, 000 |
| Charles W. Steadman | 70, 000 |
| | 140, 000 |

Upon at least three previous occasions petitioner advanced funds to other business enterprises, viz, A. C. Rice Storage, Elmire Deliv-

erics and Leaseco Corp., for the principal purpose of retaining them as legal clients.

The board of directors authorized the issuance and sale of the 140,000 shares to the four shareholders, subject to the approval of 51 percent of the debenture holders. The remaining 60,000 shares authorized by the June 30, 1961, resolution were offered for sale at $2.50 per share in the following order of priority: First, to the debenture holders; second, to the shareholders; and third, to approved parties on a private placement investment letter basis.

By majority vote, the shareholders and the debenture holders approved the issuance of the 140,000 additional shares as authorized by the board of directors. The offer for the sale of the 60,000 remaining shares was terminated by the board of directors at a regular meeting on September 20, 1961.

The 70,000 shares subscribed to by petitioner were issued in the name of Gordon Graves & Co., a New York brokerage firm. The financing by Gordon Graves & Co. was arranged by petitioner, and 32,000 of the shares issued to that company were held for his account. Petitioner paid $80,000, which he borrowed from the Union Commerce Bank of Cleveland, for these shares. In a letter to the president of the Union Commerce Bank, who was a close business acquaintance, requesting the loan, petitioner described his option to purchase Richards Music stock as "an exceptionally favorable opportunity." Projected earnings for 1961 were set out to indicate successful operations, and petitioner stated confidentially that Gordon Graves & Co. planned a public offering of Richards Music stock at approximately $8 per share. The loan was made on petitioner's 90-day personal note which was extended from time to time. The 32,000 shares were reissued in petitioner's name on August 27, 1963.

Immediately after the 140,000 additional shares were issued, the total shares held by petitioner and by Paul Richards and his wife, Bessie, when combined, represented 67 percent of the outstanding common stock of Richards Music. If the convertible debentures held by American Research had, at that time, been converted into common stock, neither the shares held by the Richardses and petitioner, when combined, nor those held by American Research, would have represented a majority interest.

Petitioner remained as secretary and general counsel for Richards Music and performed, in conjunction with associates from his partnership, various legal services required by Richards Music. One associate, Carter Donohoe, did most of Richards Music's day-to-day legal work, but his annual salary did not vary with the volume of that work. In the fall of 1961, Donohoe purchased as a speculation 2,000 shares of Richards Music stock at $1.50 per share.

Gordon Graves & Co. arranged, in the spring of 1962, for the sale of the debentures held by American Research and others to Bear, Stearns & Co. At that time, the directors appointed by American Research to the Richards Music board of directors resigned and were replaced on July 20, 1962, by persons designated by Bear, Stearns & Co. and Gordon Graves & Co.

Between January 1 and June 15, 1961, petitioner's firm rendered legal services valued at $17,500 to Richards Music. Because of its inability to pay the full value, Richards Music was billed $10,000 for these services. It satisfied this obligation during 1961. No payment was made during 1962 on accrued legal fees because of the corporation's serious financial difficulties. The yearly totals of the value of services rendered by petitioner's firm to Richards Music, for which invoices were submitted, were as follows:

| Year | Value of services rendered |
|---|---|
| 1961 | $30,400.00 |
| 1962 | 45,133.50 |
| 1963 | 37,954.00 |
| 1964 | 31,128.00 |
| | 144,615.50 |

Payments made by Richards Music for the services billed during this period were as follows:

| Year | Amount |
|---|---|
| 1961 | $10,000.00 |
| 1962 | |
| 1963 | 30,604.58 |
| 1964 | 6,432.00 |
| | 47,036.58 |

The board of directors of Richards Music projected losses for the first years of the company's operations while the acquisition plan was being carried out. From the beginning, it received glowing reports from management of the company's potential and continued to receive, through the latter part of 1962, reports of losses not greatly exceeding those budgeted. As of October 31, 1962, management reports indicated that the shareholders' equity in Richards Music exceeded $530,000.

Financial statements prepared by the management of Richards Music and submitted to its directors showed a net book value of $56,662.57, or about 32 cents per share, for its 173,200 outstanding shares of common stock as of June 30, 1961. The net book value increased to $295,451.20 (or about 84 cents per share) on 349,750 outstanding shares as of December 31, 1961, according to statements prepared for Richards Music by Ernst and Ernst and dated March 1, 1962.

As the facts later established, the board was regularly presented figures by management which failed to a substantial degree to reflect the actual costs and expenses of the corporation. In December 1962, the company treasurer spoke with petitioner concerning "the alarming financial state of the company." As a result a board of directors meeting was called for January 8, 1963, to determine the actual financial condition of the company.

At the January 8, 1963, board of directors meeting lengthy consideration was given to the operations and financial condition of Richards Music. It was reported that the corporation continued to experience an acute shortage of working capital including cash, that sales of its organs needed to be substantially increased, and that the manufacturing processes of the entire music industry, including those of Richards Music, were "antiquated." The costs of a "modernization" program were discussed. An executive committee with the power to manage the general operations of the corporation between board meetings and a special finance committee with power over financial matters during this interval were established at the meeting. In addition, upon motion by petitioner, it was resolved that four officers and directors of the corporation be given the option to purchase up to 10,000 shares each of the common stock at $4.50 per share, the "price being more than 85% of the present market value of the said common stock."

An external audit, dated March 27, 1963, prepared by Ernst and Ernst as of December 31, 1962, revealed a net loss in the year 1962 of $1,344,434.09, an excess of current liabilities over current assets of $100,908.23, and a net deficit in the shareholders' equity of $456,109.19. Of the $3,595,735.92 in current assets, $594,979.90 represented unfinished inventory and $49,668.49 consisted of cash. In response, the management of Richards Music held conferences with the debenture holders and the primary creditor, the First National Bank of Chicago. Paul Richards was replaced as president of Richards Music in April 1963, and Henry C. Porter, who had been general manager, was chosen to replace him.

In May 1963, a creditors' committee was formed to protect the creditors' interests in further operations of Richards Music. The First National Bank of Chicago and the First National Bank of Elkhart under a special arrangement with the creditors' committee advanced an additional line of credit of over $300,000, to the company, secured by its inventory and receivables. At a creditors' committee meeting on November 25, 1963, the president and vice president of Richards Music reported some success in the company's operations for the preceding 3 months.

Business operations for Richards Music continued throughout 1963. During this period, petitioner and other officers were engaged in extensive efforts to secure refinancing for Richards Music. Negotiations

with the First National Bank of Chicago, Bear, Stearns & Co., Gordon Graves & Co., the Cleveland Trust Co., Associates Discount Corp., and Heller Co. proved unfruitful. Beginning in August 1963, and continuing through February 1964, discussions were held with representatives of the Seeburg Corp. regarding the possible purchase by that corporation of a controlling interest in the stock of Richards Music. On March 6, 1964, the Seeburg Corp. conditionally proposed to reorganize and refinance Richards Music by purchasing all shares of a new class of participating preferred stock, which would be the sole voting stock, and by making available to the corporation $1 million in working capital. Richards Music would then be obligated to purchase all of its previously outstanding stock at $0.50 per share, payable out of future earnings. The conditional proposal served as a basis for further negotiations by the two corporations, but no agreement was ever reached.

At a meeting of the board of directors of Richards Music on September 17, 1963, employment agreements were authorized for the president and the treasurer of the corporation providing for a 3-year term at a basic annual salary of $20,000 and increases depending upon the yearly net profit. On March 2, 1964, in response to tendered resignations by the two officers, the board of directors authorized immediate additional payments to them, concluding that they "had invaluable knowledge of the company's affairs and that in order to preserve and protect the interests of the shareholders and creditors alike it was vitally necessary that they remain with the company." At the meeting a special adviser reported that although Richards Music was "faced with many complex and very difficult problems," with new financing the possibilities for the company were "tremendous."

Subsequently, financial statements prepared by Ernst and Ernst confirmed that Richards Music's operations for its fiscal year ended December 31, 1963, had proved equally unsuccessful. A net loss of $866,250.53 was sustained, and the net deficit in the shareholders' equity increased to $2,818,453.88. On April 15, 1964, a chapter XI arrangement proceeding under the Federal Bankruptcy Act was filed in Federal District Court, Northern Division, Indiana, and Richards Music was adjudicated bankrupt on June 26, 1964.

At the time of bankruptcy of Richards Music, the law firm of Marshman, Hornbeck, Hollington, Steadman and McLaughlin filed a claim as a general creditor in the amount of $111,989.99 for services rendered and expenses advanced. This claim was allowed after a hearing in the U.S. District Court, but an appeal from this decision, brought by the First National Bank of Chicago, is pending in the Seventh Circuit Court of Appeals.

In his 1962 joint Federal income tax return, petitioner charged as an expense against the income from his law practice the $80,000 cost

of shares of Richards Music common stock, which he alleged became worthless in 1962. The deduction was disallowed for failure to establish that the stock became worthless in 1962.

OPINION

A loss resulting from the worthlessness of a security is deductible as a capital loss if the security is a capital asset,[2] or as an ordinary loss if the security is not a capital asset.[3] In either case, the security must be shown to have become "wholly worthless" during the taxable year.[4] Therefore, we must first determine whether petitioner's stock in Richards Music became wholly worthless during 1962.

Petitioner argues that Richards Music had a substantial net worth as of December 31, 1961, but that its operating loss of $1,344,434.09 during 1962 "wiped out" the net worth, resulting in a deficit in the shareholders' equity of $456,109.19. After 1962, he contends, there was no reasonable hope that continuation of the business would result in any profit to the shareholders, and continued operations and negotiations for refinancing until the adjudication of bankruptcy on June 26, 1964, were merely an attempt to salvage as much value as possible for the creditors.

Respondent agrees with petitioner that the stock of Richards Music had value at the beginning of 1962 and that the operating losses during 1962 reduced the shareholders' equity to a deficit, but, contrary to petitioner, argues that a potential value was carried over into 1963. Continued operations during 1963, negotiations for recapitalization or sale of the stock, stock options granted to officers and directors, and an optimistic report to management in March 1964 are cited by respondent as evidence of potential value.

Petitioner has the burden of proving that in 1962 the Richards Music stock ceased to have both liquidating value, an excess of assets over liabilities, and potential value, a reasonable expectation that the assets would exceed the liabilities in the future. *Mahler* v. *Commissioner*, 119 F.2d 869 (C.A. 2, 1941); *Sterling Morton*, 38 B.T.A. 1270 (1938), affd. 112 F.2d 320 (C.A. 7, 1940). Generally, this burden is

---

[2] SEC. 165. LOSSES.

(g) WORTHLESS SECURITIES.—

(1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

(2) SECURITY DEFINED.—For purposes of this subsection, the term "security" means—

(A) a share of stock in a corporation;

[3] Sec. 1.165–5 [Income Tax Regs.]

(b) *Ordinary loss.* If any security which is not a capital asset becomes wholly worthless during the taxable year, the loss resulting therefrom may be deducted under section 165(a) as an ordinary loss.

[4] Sec. 1.165–5(b) and (c), Income Tax Regs.

met by showing an "identifiable event" in the corporate life normally considered as effectively destroying the potential value, e.g., appointment of a receiver, cessation of normal business operations, bankruptcy or liquidation.

As we said in *Sterling Morton, supra* at 1279 :

There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders. In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the stock, for already "its value had become finally extinct." * * *

We hold that after 1962 there was no reasonable expectation of future profit to the shareholders of Richards Music and that a prudent businessman would have ascertained the stock to be worthless in that year.

"One form of effective evidence [in determining worthlessness], though not necessarily conclusive, is the existence of an authoritative balance sheet showing whether assets exceed liabilities so as to leave any equity for the stock." *Mahler* v. *Commissioner, supra* at 872. In the instant case, an authoritative balance sheet for Richards Music prepared as of December 31, 1962, reveals a very substantial and unexpected net loss for 1962 of $1,344,434.09, resulting a deficit of almost a half million dollars in the shareholders equity. Only a small portion of the corporation's assets consisted of cash, while a relatively large amount consisted of unfinished goods in inventory. Three expert witnesses gave uncontroverted testimony that the stock of Richards Music was worthless at the end of 1962.

By the latter part of 1962, the corporate management was troubled by the lack of working capital, including cash, and was confronted with poor sales and the prospect of large outlays to modernize its inefficient and "antiquated" manufacturing processes. In this state of affairs, it was unlikely that Richards Music would be extended trade credit or could secure additional financing. We do not draw an inference of potential value from the fact that the board of directors granted stock options to four officers on January 8, 1963, because at that time the magnitude of the losses incurred in 1962 was not fully known. The financial statement prepared by Ernst and Ernst as of December 31, 1962, was not sent to the board until March 27, 1963.

Management's awareness of the acute financial difficulties was reflected in the concerted efforts during 1963 to secure additional financing. The First National Bank of Chicago responded with an additional

line of credit under a special secured arrangement with the creditors' committee, apparently in an attempt to protect its position as the holder of short-term notes from Richards Music totaling approximately $2,600,000. While officers of Richards Music reported at the creditors' committee meetings increased sales during 3 months of 1963, such reports were made primarily to forestall any action by creditors which would force the corporation into bankruptcy. Other efforts toward recapitalization were entirely unsuccessful, indicating a lack of faith by other businessmen in the enterprise.

The Seeburg Corp.'s position in negotiating toward a possible purchase of Richards Music stock was cautious and conditional; no offer was tendered and no agreement was reached. The mere fact of a sale, had one been consummated, would not, however, preclude a finding that the stock was worthless at the end of 1962. A loss is not any less definite and ascertained because in a later year someone is willing to take a "flyer" on it at a nominal price. *Gilbert H. Pearsall*, 10 B.T.A. 467 (1928); *Keeney* v. *Commissioner*, 116 F.2d 401 (C.A. 2, 1940). Under these circumstances, we are unable to infer, as does respondent, that a single optimistic report on the future of Richards Music, conditioned upon extensive recapitalization of the corporation, made in March 1964 by one adviser somehow signified a continuing potential value in this corporation.

The continued operation of a corporation does not of itself prove value in its stock. *Frank C. Rand*, 40 B.T.A. 233 (1939), affd. 116 F.2d 929 (C.A. 8, 1941), certiorari denied 313 U.S. 594 (1941); *Keeney* v. *Commissioner*, *supra*. Moreover, the occurrence of bankruptcy in one year does not preclude a finding, based upon corporate insolvency, of worthlessness of its stock in a prior year. *Polizzi* v. *Commissioner*, 265 F.2d 498 (C.A. 6, 1959). In imposing upon a taxpayer the difficult task of determining the year of worthlessness, the Code does not require him to be an "incorrigible optimist." *United States* v. *White Dental Co.*, 274 U.S. 398 (1927); *Polizzi* v. *Commissioner*, *supra*. In light of the devastating loss incurred by Richards Music during 1962, the complete inadequacy of its capitalization, and the inefficiency in the manufacture and sale of its products, we find that petitioner acted as a prudent businessman in taking his loss in 1962.

This determination raises a further question as to the nature of the loss. Petitioner argues under section 165(a)[5] and section 1.165-5(b), Income Tax Regs., that the loss suffered as a result of the worthlessness of Richards Music stock is deductible as an ordinary loss because his

---

[5] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

shares were not held as a capital asset. This conclusion is supported, he contends, by the following set of circumstances surrounding the purchase of the shares in 1961 and his holding of them during 1962: Additional capital was needed by Richards Music to finance its operations; the corporation elected to sell its capital stock as a means to secure the needed capital; it was necessary for petitioner to subscribe to and hold the additional shares of stock to preserve his position as secretary and general counsel to the corporation, from which he expected to derive substantial annual legal fees.

Respondent contends that petitioner has failed to establish a sufficient relationship between the holding of the Richards Music stock and the conduct of his law practice. The stock subscription was prompted, it is argued, primarily by speculative investment motives.

Whether an asset normally considered capital in nature is an integral part of a taxpayer's business so as to render a loss suffered with respect to it deductible as an ordinary loss is essentially a fact question. In making this determination, it must be borne in mind that the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly so as to effectuate the basic congressional purpose. *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955).

It is well established that losses incurred on the sale of stock acquired to insure a source of inventory for a taxpayer's business are deductible as ordinary business expenses or losses. *Journal Co.* v. *United States*, 195 F. Supp. 434 (E.D. Wisc. 1961) (publisher acquired stock in a papermill company) ; *Electrical Fittings Corporation*, 33 T.C. 1026 (1960) (electrical fittings manufacturer acquired stock in an iron castings producer) ; *Smith & Welton* v. *United States*, 164 F. Supp. 605 (E.D. Va. 1958), (department store operator acquired stock in a suit manufacturer) ; *Western Wine & Liquor Co.*, 18 T.C. 1090 (1952) (wholesale liquor dealer acquired stock in a distilling company).

The same result has been reached under similar circumstances involving the purchase of debentures, *Tulane Hardwood Lumber Co.*, 24 T.C. 1146 (1955), the purchase of bonds, *Bagley & Sewall Co.*, 20 T.C. 983 (1953), affd. 221 F.2d 944 (C.A. 2, 1955), and the advancing of funds to a corporation of which the taxpayer was a minority stockholder, *Stuart Bart*, 21 T.C. 880 (1954). In the *Bart* case, an advertising agent advanced funds to a corporation in which he held stock to enable it to meet its operating expenses and remain a client on a profitable basis.

In this case petitioner has established to our satisfaction the two essential elements in his position. First, he has shown the necessity for the purchase of the shares in controversy. Petitioner does not attempt to deduct the cost of the 12,000 shares he originally held in Richards Music. He purchased 32,000 additional shares for $80,000 only after it

became apparent that Richards Music needed additional financing and American Research offered to subscribe to the new issue of stock. In view of the understanding between Paul Richards and petitioner that so long as Richards remained president of Richards Music petitioner would serve as its general counsel, petitioner considered it essential not only that American Research be prevented from becoming a majority shareholder but also that his shares, when combined with those owned by the Richardses, represent the largest block of stock. The subscription accepted by Richards Music, which he actively helped solicit, accomplished both purposes. We are persuaded that had American Research been successful in acquiring 140,000 shares of Richards Music stock and in gaining a power of veto on the board of directors, petitioner's position as secretary and legal counsel for the corporation would have been jeopardized.

Second, petitioner has established that Richards Music represented a potential source of substantial legal fees. Clearly, by the very nature of Richards Music's organizational concept which called for extensive acquisitions and mergers, petitioner could expect that a great amount of legal work would be involved. As a matter of fact, during the 4 years of the existence of Richards Music, petitioner and his associate, Carter Donohoe, rendered an average of over $36,000 yearly in legal services to the corporation. Since losses were budgeted for the first 2 years of the corporation's operation, we do not find the lack of full payment in 1961 and 1962 for these services to augur against a reasonable expectation by petitioner of full payment after the corporation got on its feet. Since Donohoe received a specified salary from the law firm, petitioner stood to receive the direct benefit from legal fees paid by Richards Music.

Petitioner has sufficiently established that the loss suffered on the worthlessness of 32,000 shares of stock he held in Richards Music was "proximately related to his business." *Stuart Bart, supra* at 881. Accordingly, he is entitled to an ordinary loss deduction of $80,000 in 1962.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

FAY, *J*., concurring: I agree with Judge Simpson's concurring opinion, but in choosing a year I would agree with the majority that the loss was properly allowable in 1962.

---

SIMPSON, *J*., concurring: I agree with the holding that the loss was allowable in 1962, but I reach that decision for reasons different from those of the majority.

In cases such as this, it is often impossible to find the time when the stock clearly became worthless; there is likely to be a range of times, any one of which would be reasonable and defensible. Since the stock did become worthless some time, a loss is deductible for some year, and it seems unfortunate to have a taxpayer required to spend money and time defending the year chosen by him and to have the respondent spending the resources of his staff challenging the year selected by the taxpayer.

I would like to see the courts avoid these controversies by adopting a different standard of judicial review. If the taxpayer has a good reason for selecting the year chosen by him, that should be sufficient. Of course, if he selects a year solely because he derives the greatest tax advantage by claiming a deduction in that year, that is not a good reason. On the other hand, if the year chosen by him is within the realm of reason, it seems foolish to have the respondent or the courts pass judgment upon his selection and substitute their judgment for his.

If I had to choose a year in this case—1962, 1963, or 1964, I doubt that I would choose 1962. However, it is within the realm of reason, and the taxpayer apparently chose it for sufficient reasons. Therefore, I would accept his choice and allow the deduction for that year.

---

TANNENWALD, *J.*, dissenting: I cannot agree that petitioner's loss occurred in 1962. In *Sterling Morton*, 38 B.T.A. 1270 (1938), affd. 112 F. 2d 320 (C.A. 7, 1940), the essential standards for a determination of worthlessness are lucidly set forth as follows at pages 1278–1279:

*The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss.* If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. *The loss of potential value, if it exists, can be established, ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation.*

*There are, however, exceptional cases where the liabilities of a corporation are so greatly in excess of its assets and the nature of its assets and business is such that there is no reasonable hope and expectation that a continuation of the business will result in any profit to its stockholders.* In such cases the stock, obviously, has no liquidating value, and since the limits of the corporation's future are fixed, the stock, likewise, can presently be said to have no potential value. *Where both these factors are established, the occurrence in a later year of an "identifiable event" in the corporation's life, such as liquidation or receivership, will not, therefore, determine the worthlessness of the*

*stock, for already "its value had become finally extinct." De Loss* v. *Commissioner* \* \* \* [28 F. 2d 803 (C.A. 2, 1928), affirming 6 B.T.A. 784 (1927)]. Cf. *Squier* v. *Commissioner* \* \* \* [68 F. 2d 25 (C.A. 2, 1934), affirming 26 B.T.A. 1407 (1932)]; *Monmouth Plumbing Supply Co.* v. *United States,* 4 F. Supp. 349 [(D.C. 1933)].

[Emphasis added.]

I have no quarrel with the facts as found herein. Rather, I disagree with my colleagues in the majority as to the proper legal criteria to be applied to those facts. In my opinion, these criteria as expounded in the *Morton* case require the conclusion that petitioner's loss occurred subsequent to December 31, 1962. As of that date, Richards Music was actively engaged in the manufacture and merchandising of musical instruments. It had current assets having a book value of $3,600,000 and current liabilities having a book value of $3,700,000, or a net current deficit of only $100,000. The findings of fact show that, on January 8, 1963, the management foresaw a solution to the problems of the company's shortage of working capital, increased sales, and modernization of its manufacturing processes. An executive committee and special finance committee were appointed to carry out the plans which would hopefully put the company on its feet. Four officers and directors were given stock options, which indicates that they considered that the company had some reasonable prospect of successful operation. Changes in management did not take place until April 1963, and it was only in May 1963 that a creditors' committee was appointed. At that time, the company obtained an additional line of credit of over $300,000, which, even though the lender was a substantial creditor and the loan was secured by a pledge of inventory and accounts receivable, is consistent with the existence of reasonable hope that the business could be turned around. Business operations continued throughout 1963 and into 1964, when a petition in bankruptcy was filed. Concededly, Richards Music has lost money for several years and its operating loss in 1962 was substantial, but this is clearly not sufficient in and of itself to establish the worthlessness of petitioner's stock.

The foregoing is a far cry from the situation which existed in *Sterling Morton, supra,* where the company involved was an investment concern, caught by the stock market crash. As of the critical date, the book value of its assets was $145,000 (and they had a fair market value of only $42,000) and its liabilities, including a preferred stock issue which had priority over the taxpayer's common stock, aggregated $625,000. Such a company had no choice but to liquidate. Similarly, in *Mahler* v. *Commissioner,* 119 F. 2d 869 (C.A. 2, 1941), the facts that the company was in receivership and that the receiver's reports painted a hopeless picture as to the common stock were of such significance as to make that case clearly distinguishable.

If the positions herein were reversed, with petitioner claiming his loss in 1963 and respondent having disallowed it on the ground that the loss occurred in 1962, I think we would have been hard put not to sustain the deduction. In this connection, while the position expounded by Judge Simpson is an attractive one, it seems to me that his choice-of-year rule fails to accord sufficient recognition to the hard facts of tax life that rates and taxable income vary from year to year and that the tax law is based on the concept of annual accounting periods. See, e.g., *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359, 363–365 (1931); *Wingate E. Underhill*, 45 T.C. 489, 493 (1966). The most that can be said for the suggested rule is that it represents what we might like the law to be or what it ought to be, but not what the law is. Perhaps Congress may decide to modify the law accordingly, but this is its business and not ours.

I agree that the tax laws do not require that the petitioner continue to ride a dead horse. But Richards Music was neither dead nor even on its deathbed. I think the most that can be said on the record herein is that it was sick and its prospects were discouraging—indeed, very discouraging—but this is not enough. Cf. *Walter H. Goodrich & Co.*, 40 B.T.A. 960, 963 (1939). The critical element to me is that, as of December 31, 1962, the attitude of management was such that "obviously the corporation was not yet prepared to thrown in the sponge." See *Bullard* v. *United States*, 146 F. 2d 386, 388 (C.A. 2, 1944); *C. P. Mayer*, 16 B.T.A. 1239, 1241 (1929).

Thus, at December 31, 1962, Richards Music was not an "exceptional * * * [case] where the liabilities * * * [were] so greatly in excess of its assets and the nature of its assets and business * * * such that there * * * [was] no reasonable hope and expectation that a continuation of the business * * * [would] result in any profit to the stockholders." See *Sterling Morton*, 38 B.T.A. at 1279. Cf. *Columbian Rope Co.*, 42 T.C. 800, 819 (1964). I would therefore conclude that petitioner has not sustained his burden of proof.[1]

In view of this conclusion, there is no need to consider whether petitioner sustained his burden of proof that the loss was a business loss—a thorny issue where business-related investments, particularly those by lawyers,[2] are involved. I note in passing, however, that the record before us does not clearly show that Richards Music was such a critical element of petitioner's business so as to require us to apply the source-of-supply cases or our decision in *Stuart Bart*, 21 T.C. 880 (1954),[3] or that petitioner was unable to find an outside investor (e.g.,

---

[1] I note in passing that petitioner did not claim a capital loss on his 1962 return with respect to the 12,000 shares in Richards Music which he had acquired at an earlier date and which he concededly held for investment, although he reported substantial capital gains.

[2] See *Frank A. Garlove*, T.C. Memo. 1965–201.

[3] In that case the customer was a source of both direct and indirect business and the taxpayer's credit standing was also involved. See 21 T.C. at 881.

another nonstockholder like Gordon, Graves & Co.) for the 32,000 shares which he acquired, as he was able to do with respect to 38,000 of 70,000 shares which the existing stockholders were *unwilling to* purchase in order to keep American Research Development out of the picture.

DRENNEN, TIETJENS, RAUM, and HOYT, *JJ.*, agree with this dissenting opinion.