PIERRE J. AND K. PATRICIA B. LeLANDAIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Le Landais v. Commissioner
Docket No. 8643-73.
United States Tax Court
T.C. Memo 1976-345; 1976 Tax Ct. Memo LEXIS 55; 35 T.C.M. (CCH) 1580; T.C.M. (RIA) 760345; November 15, 1976, Filed John G. Dalton, Jr., for the petitioners. Jack H. Klinghoffer, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency in petitioners' income tax for the year 1970 in the amount of $5,083.91. Other issues having been disposed of by agreement of the *57 parties, the issues remaining for decision are: (1) Whether the following assets of petitioners became worthless during the year in issue: (a) A $3,198 note from Children's Movie of the Month; (b) Stock of Children's Movie of the Month; (c) A $9,700 note from Paulmann Productions, Inc.; and (d) Stock of Paulmann Productions, Inc. (2) Whether the debts noted above were business or nonbusiness debts. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time petitioners filed their petition, they resided in New York City. Patricia LeLandais is a party to this case solely by virtue of having filed a joint return with her husband. Pierre LeLandais will be referred to herein as petitioner. During the years 1966 through 1970, petitioner was an investment banker. Although originally self-employed, from 1966 through a portion of 1968, he was a partner in the firm of Stralem and Company ("Stralem"), an investment banking corporation listed on the New York Stock Exchange.[1] During the latter part of 1968, petitioner joined the investment firm of Hamershlag, Borg and Company ("Hamershlag") and remained a partner of that firm for approximately *58 two years. During that two year period, petitioner also served as president of Hamborg Securities Corporation, a corporation organized by Hamershlag to engage in investment banking activities. On or about April 30, 1970, petitioner left Hamershlag to become the senior partner of another investment banking firm, Merkin and Company ("Merkin"). As an investment banker, petitioner advised client companies concerning their various options and opportunities for expansion, promoted business corporations, developed new ideas for small companies, assisted corporations with investment planning, and, when necessary, located new sources of corporate financing. In return for his services, petitioner received consultation fees from the companies he assisted as well as from the investors he attracted. Another component of his compensation was the possibility of appreciation in the value of stock which he often purchased in the companies he assisted. Children's Movie of the Month, Inc.
In 1969, while a member of Hamershlag, petitioner helped organize Children's Movie of the Month, Inc. ("Children"). *59 Children was formally incorporated in June 1969. Thereafter Children acquired rights to films for children from motion picture companies and processed these films for distribution. These rights were non-transferable and would revert back to the companies if Children did not use the films. Children's distribution plan involved the sale of tickets in advance of the showing of the film. To finance Children, it was petitioner's responsibility to raise approximately $325,000 in capital from private investors. Eventually petitioner located nine investors who agreed to purchase 25,000 shares of Children's common stock at one dollar a share and to loan Children $300,000. One of these investors, Oxford Associates, had agreed to purchase 4,167 shares of Children's common stock and to loan Children $50,000 in exchange for Children's promissory note. At the last minute, Oxford Associates reneged upon its agreement to invest in Children. Given his prior promises to Children, petitioner felt that Hamershlag was obligated to assume Oxford Associates' commitment, and his partners concurred. Thus the firm, on behalf of its partners, advanced $54,167 to Children in exchange for a non-negotiable *60 note payable January 26, 1970. Hamershlag also agreed to attempt to obtain a permanent investor who would exchange Children's note held by Hamershlag for a subordinated, nonnegotiable $50,000 note and for 4,167 restricted shares of Children's common stock. In the event that a substitute purchaser could not be located, Hamershlag would assume the entire $54,167 investment. Petitioner directed Hamershlag's efforts to find substitute purchasers for Children's note and stock. Other Hamershlag partners also sought placement of the note and stock. However, their combined efforts were unsuccessful, and Hamershlag, acting as nominee of the individual partners, exchanged the note it held for 4,167 shares of stock and a onesixth interest in Children's $300,000 subordinated note, due November 25, 1974. The firm then debited the accounts of each of the partners in accordance with the amount of his interest in Children. In this manner petitioner acquired 801 shares of Children's common stock and a proportionate interest of $3,198 in the subordinated note. Separate certificates for the note and stock were not issued petitioner since the firm was the formal noteholder and purchaser of the *61 stock. Children soon suffered financial difficulties. Its $300,000 of initial funds were spent primarily on processing, editing, and duplicating the films. By September 30, 1970, Children's films were in distribution; however Children's management had not reserved sufficient funds to develop adequately its potential market. After one year of operations, Children's assets totaled $114,968.19, with $91,428.75 of that figure being current assets. Besides its cash of $21,048.07 and accounts receivable of $3,874.18, none of its current assets were readily convertible into cash. Its liabilities totaled $350,091.66, with $50,091.66 of that figure being current liabilities. Children's income statement for the first year was disheartening, showing a net loss of $281,539.50. The balance sheet for the following three-month period, June through September 1970, revealed that by September Children's assets had shrunk to $103,172.49, and its current assets had fallen to $80,589.57. Of these current assets, $6,072.65 was cash, $24,369.43 was accounts receivable, and the remaining current assets were not readily convertible into cash. Liabilities had increased to $380,990.23, with current *62 liabilities being $80,990.23. The income picture also had not improved. The net loss from operations for that threemonth period was $42,694.27. Children continued to receive revenues and pay expenses until January 29, 1971, but no financial statements were prepared after September 1970. In January 1971, its last month of operation, Children had not yet released its employees; and during that month it received $5,830.25 in revenues from ticket sales and paid $6,208.72 in expenses. Sometime late in 1970 Children began negotiating with Standard Reference Library to distribute Children's films through a major chain of supermarkets.These negotiations continued into 1971. If they had been successful, Children's financial problems would very likely have been cured. However, on or about January 15, 1971, the negotiations terminated unsuccessfully. On January 22, 1971, Children's president took steps to have Children cease operations. Petitioner's stock and notes in Children became worthless sometime between January 1, 1970 and January 22, 1971. However, petitioner has not proved that worthlessness occurred in 1970. Paulmann Productions, Ltd.
In 1966, petitioner joined *63 Paul Manning ("Manning") and H. Kay Kerr ("Kerr") in the formation of Paulmann Productions, Ltd. ("Paulmann"), a company organized to prepare motion picture scripts for sale to major motion picture studios. Manning served as president; petitioner was vice president, secretary and treasurer; and Kerr also served as a vice president. Manning contributed to the new company the rights to a script he had authored, while petitioner and Kerr provided capital.Petitioner, on March 5, 1966, purchased 30 shares of Paulmann stock at ten dollars a share, and loaned the company $9,700. By a note of the same date, Paulmann agreed to repay petitioner's loan on September 3, 1966. Kerr advanced $5,000 to the new company. Petitioner received no fees or commissions for his work in helping to form Paulmann. When petitioner's note became due on September 3, 1966, Paulmann did not have sufficient funds to pay the principal amount. Petitioner, realizing that seeking payment from Paulmann would be futile, did not demand collection or pursue his other legal remedies. At some point Paulmann acquired the rights to two other movie scripts. During 1966 through 1970, Manning made many efforts to market *64 these scripts, making use of his many acquaintances in the film industry. Petitioner only occasionally attempted to sell the scripts. In 1967 alone, Manning made ten or fifteen attempts, but none were successful. At other times Manning, during his vacation periods, traveled to film companies in California and England in a further effort to sell the scripts. Potential buyers indicated they would be interested in the scripts only if Paulmann substantially revised them. Estimates of the cost of revisions ranged from $25,000 to $100,000 per script. Paulmann lacked such funds. It had no current income, and its initial $15,000 of funds had been substantially exhausted by 1967. Manning encouraged petitioner to seek additional investment capital to finance the revisions and to continue promotion of the scripts. Petitioner made sporadic efforts, including a final effort in 1970, but found no additional sources of funding. By 1970 he decided he would not put any more of his own funds into the corporation. In 1970, Manning accepted employment with a newspaper syndicate to do articles on Africa, though he still made occasional efforts to promote the scripts. Towards the end of 1970 petitioner *65 reviewed his investment commitments to prune the number of investment projects in which he was involved. He decided to eliminate his involvement in Paulmann. Besides a small amount of cash, Paulmann's only assets at this time were the three unrevised scripts. Petitioner felt he could do nothing to increase their value, and so, on December 29, 1970 he sold his Paulmann note and stock to Manning for one dollar. At the time of the trial Manning felt that the scripts still had value. He felt it was "very honorable" of petitioner to sell him the note and stock for one dollar so that he would not have the note "hanging over his head." Manning appears to have been unreasonably optimistic about the scripts. On his 1970 income tax return, petitioner claimed a business bad debt in the amount of $3,198 arising from the worthlessness of the note from Children, and a long-term capital loss in the amount of $801 arising from the worthlessness of his Children common stock. He also claimed a business bad debt of $9,700 arising from the worthlessness of the Paulmann note, and a long-term capital loss in the amount of $299 arising from the worthlessness of the Paulmann common stock. In his notice *66 of deficiency, respondent disallowed all of these deductions. OPINION 1. Children's Movie of the Month, Inc., Note and Stock.
In 1969 petitioner loaned $3,198 to Children's Movie of the Month, Inc. ("Children"), a company newly organized to distribute films, and purchased some of its stock. The new enterprise did not fare well and by 1971 ceased functioning. Petitioner asserts that he is entitled to a business bad debt deduction on account of his debt and a capital loss on account of his stock in 1970. Respondent denies that 1970 was the year of worthlessness, and we agree with respondent. Section 166(a)[2] provides generally that any debt which becomes worthless within the taxable year is allowed as a deduction. The question of when a debt becomes worthless is a factual one, with the burden of persuasion resting with petitioner. Herbert W. Dustin,53 T.C. 491, 501 (1969), affd. 467 F. 2d 47 (9th Cir. 1972). "In order to satisfy their burden of proof, the petitioners must show that the debt had some value at the end of [1969] and that it *67 had become worthless by the end of [1970]. This means a lack of potential value as well as current liquid value. Worthlessness must be determined by objective standards; generally this burden is met by showing that some identifiable event occurred during the course of the year which effectively demonstrates the absence of potential value, although such is not indispensable." Herbert W. Dustin,supra at 501. Losses resulting from securities becoming worthless during the taxable year are allowed as a deduction under section 165(a). These losses generally are treated as a loss from the sale or exchange of a capital asset. Section 165(g)(1). A finding of worthlessness depends upon all of the facts of a particular case, with the burden of persuasion resting on petitioner. Boehm v. Commissioner,326 U.S. 287, 293-294 (1945). As we stated in Sterling Morton,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F. 2d 320 (7th Cir. 1940): *68 The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. Charles W. Steadman,50 T.C. 369, 377 (1968), affd. 424 F. 2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). Petitioner contends that, since Children's current liabilities exceeded *69 its current assets in 1970, his debt and stock in Children were worthless. Insolvency, however, does not by itself establish worthlessness. Richard R. Riss, Sr.,56 T.C. 388, 408 (1971), affd. 478 F. 2d 1160 (8th Cir. 1973). Furthermore, petitioner's insolvency conclusion is not supported by the record. Children's financial statements do not extend beyond September 30, 1970. We have no information concerning the final three months of 1970. On the incomplete evidence before us, we do note the dramatic six-fold increase in Children's accounts receivable between June 30 and September 30, 1970. We are left wondering whether this increase continued into the final months of 1970. We also do not have as clear a picture as we would like concerning the rate of conversion of accounts receivable into cash or concerning the degree of immediacy of payment of the current liabilities. If petitioner had shown that the resources of Children, which were convertible to cash, were far smaller than upcoming and nonpostponable liabilities, then we would have considered his assertion *70 concerning insolvency to have been more persuasive. Even if we assume that petitioner satisfactorily established insolvency, we must still consider Children's negotiations with Standard Reference Library. Petitioner would like us to infer from the unsuccessful termination of negotiations on January 15, 1971 that the negotiations had already failed by December 31, 1970. We cannot make such an inference. Petitioner, on whom the burden of persuasion lies, has not shown us when the negotiations began or how they stood on December 31, 1970. Negotiations of this type may be so mercurial as to collapse unexpectedly. Petitioner has submitted no evidence dispelling this possibility. Petitioner further argues that Standard would never agree to work with a company with the financial history of Children and therefore the negotiations were doomed from their beginning. However, were this the case, presumably there would have been no point in commencing such negotiations. We note that, on Children's balance sheet, the bulk of its liabilities were long-term notes owing to Children's own shareholders and thus were probably less pressing than current liabilities owed to unrelated parties. *71 Further, although Children had reported considerable losses, these losses chiefly reflected the start-up expenses of preparing the films for distribution, a process apparently completed by the end of 1970. We find it conceivable that, in such a context, Standard could have been quite interested in an association with Children. Petitioner has not shown otherwise.Compare Charles W. Steadman,50 T.C. 369, 378 (1968), affd. 424 F. 2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970).
Petitioner, in the alternative, submits that the debt and stock became worthless in 1971. However, 1971 is not before us. Having concluded that the debt did not become worthless in 1970, we need not reach the question whether the debt was a business or non-business debt. 2. Paulmann Productions, Ltd. Note and Stock.
In 1966 petitioner loaned $9,700 to Paulmann Productions, Ltd. ("Paulmann"), a company newly organized to market film scripts, and purchased some of its stock. Paulmann proved to be an unsuccessful venture and underwent a prolonged and agonizing decline before it halted operations in 1970. Petitioner argues that he is entitled *72 to a business bad debt deduction on his note and a capital loss on his stock in Paulmann in 1970 or, alternatively, in 1968. Respondent denies that the loss was a business bad debt or that Paulmann's note or stock became worthless in either 1970 or 1968. We conclude that petitioner's debt and stock became worthless at a date in 1970 prior to petitioner's sale of his note and stock to Manning on December 29, 1970. As noted in part one of this opinion, petitioner bears the burden of persuasion that his debt and stock in Paulmann were worthless. Herbert W. Dustin,supra at 501; Boehm v. Commissioner,supra at 294. This burden may be met by establishing an identifiable event which clearly marks the futility of any hope of recovery. Herbert W. Dustin,supra at 501; Charles W. Steadman,supra at 377; Sterling Morton,supra at 1278-1279. Petitioner has established such an identifiable event in 1970. Efforts to market Paulmann's scripts had failed since the company's inception and were faring no better in 1970. Its cash position had been poor since 1968 and had only worsened by 1970. Petitioner made his final effort to secure *73 additional investment capital in 1970, but was rebuffed. He also decided not to advance any more of his own funds to Paulmann in 1970. Finally, and most importantly, 1970 was the year in which Manning, the person doing the most to market the scripts, decided to accept other employment and to curtail his selling efforts. Deprived of Manning's vigorous selling efforts and access to Manning's acquaintances in the film industry, Paulmann's prospects of selling the scripts disappeared. Therefore we conclude that 1970 was the year of worthlessness for petitioner's debt and stock in Paulmann. Having resolved the issue of worthlessness in favor of petitioner, we must next decide whether petitioner's debt was a business or non-business one. A non-business debt is a debt other than one created or acquired in connection with petitioner's trade or business (section 166(d)(2)(A) or a debt the loss from the worthlessness of which is incurred in petitioner's trade or business (section 166(d)(2)(B)). Losses attributable to non-business debts are treated as short-term capital losses. Section 166(d)(1)(B). *74 Petitioner contends that he was an investment banker and promoter of new corporations. Respondent denies that petitioner was an investment banker and asserts that he was actually a passive investor. We conclude that, even if we assume petitioner was an investment banker and promoter, his investment in Paulmann does not come within section 166(d)(2). As the Supreme Court pointed out in Whipple v. Commissioner,373 U.S. 193, 202 (1963), in interpreting the substantially identical section under the 1939 Code: Even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. Thus petitioner must not only be in the trade or business of being a promoter, but the debt in issue must be proximately related to that trade or business. Towers v. Commissioner,247 F. 2d 233, 236 (2d Cir. 1957), affg. 24 T.C. 199 (1955), *75 cert. denied 355 U.S. 914 (1958); Aubrey S. Nash,31 T.C. 569, 573 (1958); Ida A. Van Dyke,23 B.T.A. 946, 949 (1931), affd. 63 F. 2d 1020 (9th Cir. 1933), affd. percuriam291 U.S. 642 (1934). Petitioner bears the burden of establishing that the relation between the investment and the trade or business is proximate. United States v. Clark,358 F. 2d 892, 895 (1st Cir. 1966), cert. denied 385 U.S. 817 (1966). Although the inquiry concerning proximate relation is a factual one, Samuel Towers,24 T.C. 199, 233 (1955), affd. 247 F. 2d 233 (2d Cir. 1957), cert. denied 355 U.S. 914 (1958), the courts have emphasized certain factors as being indicative of such a relation. The receipt of fees or commissions, Whipple v. Commissioner,supra at 202, or of stock (provided that the stock was compensation for services *76 rather than received in exchange for invested capital, Townshend v. United States,384 F. 2d 1008, 1012-1013 (Ct. Cl. 1967)), and the devotion of significant amounts of time, energy, and talent to the promotion of the particular investment, Henry E. Sage,15 T.C. 299, 304 (1950), are indications that the investment is proximately related to the trade or business of being a promoter. Another factor is whether a sale of the promoter's interest in the corporation for a profit occurs at a point in time reasonably close to the corporation's initial organization and promotion stage.Cf. Whipple,supra at 202; Townshend v. United States,supra at 1012-1013; I. Hal Millsap, Jr.,46 T.C. 751, 757 (1966), affd. 387 F. 2d 420 (8th Cir. 1968). Petitioner has failed to carry his burden of persuasion concerning the issue of proximate relation. He has not shown that he received any fee or commission from Paulmann for his efforts or that there was ever any plan for Paulmann to make such a payment to him. Further, he received his shares of stock in return for the capital he contributed and *77 not for services rendered. Petitioner did not sell his interest in Paulmann until the corporation was on the verge of collepse, and there is no indication in the record that he ever intended to make an early sale. What testimony petitioner gave on the subject supports the inference that he viewed Paulmann as an investment: * * * we were going to incorporate the project so that most of our money would be repaid out of the loan and then the profit, which we -- we were hopeful that we would make upon development of that motion picture, would be distributed to the individuals in a pre-determined fashion; that is, according to the number of shares that each -- each held in that corporation. * * * There is no evidence that petitioner devoted significant time, energy, or talent to Paulmann. Petitioner's relationship to Paulmann appears to be no more than that of an investor putting money into a speculative venture. We conclude that petitioner's Paulmann note was a non-business bad debt. Decision will be entered under Rule 155. Footnotes
1. Although Stralem was in form a corporation, its owners were denominated partners.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩