FREDERICK M. FRAZIER and ALICIA FRAZIER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Frazier v. Commissioner
Docket No. 9145-72.
United States Tax Court
T.C. Memo 1975-220; 1975 Tax Ct. Memo LEXIS 153; 34 T.C.M. (CCH) 951; T.C.M. (RIA) 750220; July 3, 1975, Filed Paul R. Hodgson and James R. Hays, for the petitioners. Randolph A. Monsur, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined a deficiency in petitioners' Federal income tax for the taxable year 1969 in the amount of $ 278,919.24. The issues for decision are: (1) Whether the Commissioner *154 abused his discretion under section 482 of the Code [1] in allocating to Petitioner Frederick M. Frazier gain from the sale of his interest in appreciated real property distributed to him by a partnership of which he was a 50 percent partner and transferred by him to wholly owned corporations having large net operating losses who, within 26 days, sold such interests to a major creditor of the corporations at a substantial gain; (2) The year of worthlessness of corporate stock; and (3) Whether losses sustained by Petitioner Frederick M. Frazier in connection with a guaranty and advances to his wholly owned corporations are deductible as business bad debts or nonbusiness bad debts or whether they represent contributions to capital. Also involved is the year of worthlessness. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference. Frederick M. and Alicia Frazier, husband and wife, filed their joint Federal income tax returns for the taxable years 1969 and 1970 *155 with the Internal Revenue Service Center, Austin, Texas. They resided in Bella Vista, Arkansas, at the time they filed their petition. Petitioner Frederick M. Frazier (hereinafter petitioner) entered the real estate construction industry in 1953 and since that time has been actively engaged in such business activity in his individual capacity, as a partner in various general real estate partnerships, and as a corporate shareholder. A good credit rating and reputation was required in the construction and real estate investment business which relied heavily on borrowed funds. It was the general practice of the construction industry and the institutions petitioner dealt with to deny credit to an individual who controlled a corporation unable to pay its debts. Petitioner was, at all times material herein, the sole shareholder, president and manager of Beck Homes Company, Inc., (hereinafter Beck Homes) and Southside Cabinet Company, Inc., (hereinafter Southside Cabinet). Beck homes filed its Federal income tax returns for taxable years ending May 31 and was in the business of residential and commercial construction in the Tulsa, Oklahoma, area. Southside Cabinet filed its Federal income *156 tax returns for taxable years ending November 30 and was in the business of cabinet manufacturing and wood trim work on residential property with Beck Homes as its principal customer. Tulsa Rig, Reel and Manufacturing Co., Inc. (Tulsa Rig) was the primary supplier of lumber to Beck Homes from 1958 to 1970, having sold to it between a million to a million and a half dollars worth of lumber. Tulsa Rig guaranteed a $ 300,000 line of credit for Beck Homes at Farmers and Merchants Bank (F & M Bank) in Tulsa. During 1968 or 1969, it became apparent to Tulsa Rig that Beck Homes was having difficulty in making its payments to F & M Bank on the line of credit guaranteed by Tulsa Rig and in making its payments to Tulsa Rig for lumber purchases. Accordingly, on or about the same time, Tulsa Rig terminated the line of credit at F & M Bank. In early September 1969, Tulsa Rig and petitioner discussed the possible use of Harvard Towers to aid Beck Homes with its financial problems. Harvard Towers was a commercial office building and shops owned and operated by Frazier-Baker Properties, a partnership in which petitioner was a 50 percent owner. Harvard Towers had been constructed by the partnership *157 on February 9, 1965. Tulsa Rig did not consider the purchase of Harvard Towers as an investment but rather as a method to obtain repayment of its debts from Beck Homes and Southside Cabinet. In its negotiations, Tulsa Rig did not demand that petitioner transfer Harvard Towers to Beck Homes and Southside Cabinet prior to its purchase, but it did consider a transfer to the corporations and a purchase directly from them to be a means to insure that the proceeds of the purchase would be applied to satisfy the indebtedness to Tulsa Rig. On August 29, 1969, petitioner withdrew his 50 percent partnership interest in Harvard Towers from the Frazier-Baker Properties partnership and on September 4, 1969, transferred nine-tenths of that interest to Beck Homes and the remaining one-tenth to Southside Cabinet. The ratios were based, in part, upon the net operating losses of each corporation. The transfer was accompanied by an assumption by Beck Homes and Southside Cabinet of their proportionate shares of $ 812,899.72 in liabilities encumbering petitioner's interest in Harvard Towers. The board of directors minutes of Beck Homes and Southside Cabinet dated September 3, 1969, describe the transfer *158 of Harvard Towers from petitioner to the corporations as a "contribution to capital." At the time of the transfer, petitioner's basis of his one-half interest in Harvard Towers was $ 676,387.67. On October 9, 1969, Beck Homes and Southside Cabinet entered into a contract to sell their respective interests in Harvard Towers to Tulsa Rig with October 1, 1969, being the effective date of the sale in order to facilitate the allocation of rents and related items. Harvard Towers was never offered for sale by petitioner or by Beck Homes-Southside Cabinet to anyone other than Tulsa Rig. Beck Homes received $ 382,500 in cash from Tulsa Rig and, upon Tulsa Rig's assumption of Beck Homes' share of the Harvard Towers liability, Beck Homes reported a realized gain of $ 382,384.80. Southside Cabinet received $ 42,500 in cash and, upon Tulsa Rig's assumption of Southside Cabinet's share of the Harvard Towers liability reported a realized gain of $ 42,487.20. Although the drafted agreements for the sale of Beck Homes' and Southside Cabinet's interests in Harvard Towers did not contain any specific requirements concerning the use of the proceeds from the sale, $ 220,858.03 of the $ 382,500 proceeds *159 received by Beck Homes from Tulsa Rig was paid to F & M Bank closing out Beck Homes' loan accounts with the bank. In addition, other creditors of Beck Homes were satisfied from the Harvard Towers sale proceeds, including Tulsa Rig, to the extent of $ 114,343.60. The $ 42,500 of sale proceeds received by Southside Cabinet were used for its operations. Petitioner, at that time, had outstanding a substantial account receivable for advances he had made to Beck Homes, none of which was satisfied out of the sales proceeds from the sale of the Harvard Towers interest to Tulsa Rig. Petitioner would have transferred additional property to the corporations to aid them in meeting the demands of creditors but he had no property other than Harvard Towers. On their 1969 Federal income tax return, petitioners reported a gain of $ 136,512.05 taxable as ordinary income with the description "Sale under IRC Sec 1239." Petitioner had a basis of $ 450 in the stock of Southside Cabinet. Beck Homes originally issued three shares of stock to petitioner and three shares to Arthur W. Beck, Jr., at $ 100 per share. Arthur W. Beck, Jr.'s three shares were acquired as treasury stock on or about November 30, 1964 for *160 $ 103,271.97, and petitioner's three shares were the only issued and outstanding stock during the years in question. The paid-in capital account for Beck Homes from September 30, 1958 through the years in question reflects the following activity: BECK HOMES COMPANY, INC. Paid-in Capital September 1958 through February 28, 1971
FROM
9/30/58 Transfer
from
Folio
Arthur
Fred M.
CREDIT
Beck Homes Co.
Ref.
W. Beck
Frazier
Amount
Balance
(Partnership)
JR-1
$
$ 29,033.27
$ 58,066.54
$ 58,066.54
29,033.27
9/30/59
CR-4
1,766.73
1,766.73
3,533.46
61,600.00
11/30/59
JR-12
7,000.00
7,000.00
14,000.00
75 ,600.00
4/30/60
CR-12
550.00
550.00
1,100.00
76,700.00
5/31/60
CR-13
187.50
187.50
375.00
77,075.00
7/31/60
CR-2
387.88
387.88
775.76
77,850.76
10/31/60
CR-6
800.00
800.00
1,600.00
79,450.76
$
$ 39,725.38
$ 79,450.76
39,725.38
During 1965 petitioner advanced $ 60,000 to Beck Homes and during 1968 he advanced an additional $ 60,000. There were no notes, no security, no provisions for the payment of interest and no date set for repayment of either $ 60,000 davance. Of the $ 120,000 advanced, *161 petitioner withdrew $ 37,012.60 from Beck Homes prior to December 31, 1970, thereby leaving a balance on December 31, 1970, of $ 82,987.40. On January 9, 1971 petitioner received an additional $ 600 reducing the balance to $ 82,387.40. On August 29, 1969, Tulsa Rig lent Beck Homes $ 75,000 on a note personally guaranteed by petitioner and secured by a mortgage on real property owned by petitioner. The $ 75,000 Tulsa Rig loan was used by Beck Homes to pay some of its creditors including $ 50,287.15 paid to Southside Cabinet who in turn used the $ 50,287.15 to pay its creditors. Petitioner did not expect to recover any money or property from Beck Homes at the time he guaranteed the $ 75,000 loan. The guaranty and Tulsa Rig advances were intended to temporarily alleviate creditor demands and thereby allow time for the transfer of the Harvard Towers interest which would aid Beck Homes and Southside Cabinet in meeting their debts. Therefore, the ultimate purpose of petitioner's guaranty of the $ 75,000 note was to preserve, to the extent possible, petitioner's credit and to allow him to continue in the real estate construction industry. On September 15, 1970, petitioner, as guarantor of *162 the $ 75,000 Tulsa Rig note, made a partial payment of $ 7,500. Petitioner aggregated the $ 7,500 payment and the $ 82,387.40 of unpaid advances and deducted $ 89,887.40 on the 1970 joint Federal income tax return as a "Business Bad Debt from Insolvent Corporation Beck Homes Inc., Tulsa, Oklahoma." On May 31, 1969, Beck Homes had a net operating loss carryover of $ 344,228.33. On December 1, 1968, Southside Cabinet had a net operating loss carryover of $ 57,920.92. The book values of the assets and the liabilities of Beck Homes before (May 31, 1969) and after (May 31, 1970) the transfer and sale of the Harvard Towers interest to Tulsa Rig and on December 31, 1970, were as follows: BECK HOMES COMPANY, INC. Comparative Balance Sheets (As at Dates Indicated) ASSETS
May 31, 1969
Cash (deficit)
$ $ (14,281)
Notes receivable
6,853
Accounts receivable - trade
5,956
Less provision for uncollectible
___
5,956
accounts
Accounts receivable - employees
3,591
Less provision for uncollectible
___
3,591
accounts
Accounts receivable - Southside
34,961
Cabinet Co.
Less provision for uncollectible
___
34,961
account
Account receivable -
10,242
Robinson-Frazier Co.
Less provision for uncollectible
___
10,242
account
Inventories: Construction in progress
389,774
Unimproved (vacant) lots
37,203
426,977
Fixed assets
20,580
Less accumulated depreciation
7,882
12,698
Prepaid expenses
5,479
Total Assets
$ 492,476
LIABILITIES
Payroll taxes payable
$ 16,496
Accounts payable - trade
171,894
Accrued interest payable
32,263
Accrued real estate taxes
2,934
payable
Accrued state income taxes
payable
Customers' deposits
104,199
Notes payable
444,742
Notes payable - Fred Frazier
$ 114,418
Less amounts due from Fred
___
114,418
Frazier
Notes payable - Fred Frazier -
___
Note 1
Total Liabilities
886,946
Net Worth (Deficit)
Note 1 - Payment made by Fred
[394,470)
Frazier to Tulsa Rig, Reel &
Mfg. Co.
on the $ 75,000 note due and on
which Fred Frazier guaranteed
personally. *163 ASSETS
May 31, 1970
December 31, 1970
Cash (deficit)
$ $ 948
$ $ 776
Notes receivable
Accounts receivable - trade
1,137
1,129
Less provision for uncollectible
___
1,137
1,129
accounts
Accounts receivable - employees
3,476
3,476
Less provision for uncollectible
___
3,476
3,476
accounts
Accounts receivable - Southside
93,810
87,168
Cabinet Co.
Less provision for uncollectible
87,168
6.642
87,168
account
Account receivable -
9,985
9,985
Robinson-Frazier Co.
Less provision for uncollectible
9,985
9,985
account
Inventories: Construction in progress
143,268
Unimproved (vacant) lots
32,809
176,077
___
Fixed assets
12,970
Less accumulated depreciation
6,830
6,140
___
Prepaid expenses
638
___
Total Assets
$ 195,058
$ 776
LIABILITIES
Payroll taxes payable
$ 1,235
$ 403
Accounts payable - trade
41,727
27,823
Accrued interest payable
12,517
Accrued real estate taxes
2,299
643
payable
Accrued state income taxes
11,741
11,741
payable
Customers' deposits
Notes payable
211,756
73,790
Notes payable - Fred Frazier
$ 115,065
$ 82,987
Less amounts due from Fred
5,106
109,959
7,236
75,751
Frazier
Notes payable - Fred Frazier -
___
7,500
Note 1
Total Liabilities
391,234
197,651
Net Worth (Deficit)
Note 1 - Payment made by Fred
[196,176)
[196,875)
Frazier to Tulsa Rig, Reel &
Mfg. Co.
on the $ 75,000 note due and on
which Fred Frazier guaranteed
personally. *164 Beck Homes' income statements for its fiscal year ending May 31, 1969, for May 31, 1970, and for seven months ending December 31, 1970, were as follows: BECK HOMES COMPANY INC. Comparative Income Statements (as at Dates Indicated) For the Year
For the Year
For Seven
Ending
Ending
Months
May 31, 1969
May 31, 1970
Ended Dec. 31,
1970
SALES
$ 915,925.41
$ 444,715
$ 219,853
RENTAL INCOME -
Harvard Towers
0
115
0
OTHER INCOME
28,287.74
19,989
0
944,213.15
464,819
219,853
COST OF SALES AND EXPENSES: Cost of Sales
$ 892,221.16
$ 447,056
$ 202,404
Plans Expense
0
895
0
Commissions
0
0
1,787
Salaries
86,203.26
49,729
1,540
Office Expense
0
5,033
1,323
Repairs & Supplies
0
1,569
236
Utilities
0
3,610
194
Office Rent
560.00
280
0
Postage
0
224
0
Auto Expense
0
4,746
2,179
Advertising
4,848.08
29
85
Travel
0
3,186
40
Legal & Accounting
0
3,407
1,827
Employee Benefits
0
(197)
0
Insurance
0
1,709
(1,014)
Interest & Penalties
46,118.29
15,482
2,192
Payroll Taxes & Insurance
5,616.26
3,552
74
Other Taxes
0
12,266
1,714
Depreciation
772.77
2,096
1,041
Miscellaneous
[1] 59,987.93
1,087
0
Dues & Subscriptions
0
380
325
Uncollectible Accounts
0
97,153
4,605
TOTAL
$ 1,096,327.75
$ 653,292
$ 220,552
NET INCOME (LOSS) BEFORE
Extraordinary Item
( 152,114.60)
(188,473)
(699)
SALE OF ASSETS -
Harvard Towers
0
382,385
0
NET INCOME (LOSS)
[ 152,114.60)
$ 193,912
$ (699)
*165 Comparative balance sheets for Southside Cabinet as of November 30, 1969 and April 30, 1970 were as follows: SOUTHSIDE CABINET, INC. Comparative Balance Sheets (As at Dates Indicated)
ASSETS
November 30, 1969
April 30, 1970
Cash (deficit)
$ (8,497)
$ (6,349)
Accounts receivable
$ 47,428
$ 23,131
Less provision for
uncollectible accounts
47,428
13,131
10,000
Inventory
Fixed Assets
26,977
26,977
Less accumulated depreciation
10,092
16,885
11,861
15,116
Total Assets
$ 55,816
$ 18,767
LIABILITIES
Payroll taxes payable
$ 3,299
$ 1,204
Sales taxes payable
861
266
Accounts payable - trade
54,876
30,101
Accounts payable - Beck Homes
66,960
93,010
Co. Inc.
Notes payable - equipment
24,917
20,705
Notes payable - bank
21,762
Total Liabilities
172,675
145,286
Net Worth (Deficit)
$ (116,859)
$ (126,519)
Southside Cabinet's income statements for its fiscal year ending November 30, 1969 and for five months ending April 30, 1970 were as follows: *166 SOUTHSIDE CABINET, INC. Comparative Income Statement (As at Dates Indicated) For the Year Ended
For the Five Months
November 30, 1969
Ended April 30, 1970
Sales
$ 287,730
$ 86,357
Rental income - Harvard Towers
13
Other income
35
8
287,778
86,365
Cost of Sales and Expenses: Cost of sales
$ 334,918
$ 67,860
Salaries and wages
4,543
800
Advertising
12
Telephone
523
98
Utilities
2,609
1,277
Interest
5,881
956
Depreciation
4,306
1,769
Rentals
11,210
4,366
Repairs
1,216
124
Indirect materials
666
324
Insurance
5,012
1,441
Office expense
429
49
Legal
15
1,003
Dues and subscriptions
292
90
Taxes - payroll
6,159
1,868
Taxes - other
5,280
354
Overhead charges
2,400
Miscellaneous
1,627
503
Uncollectible accounts
13,131
Total
387,086
96,025
Net income (loss) before
extraordinary item
(99,308)
(9,660)
Sale of assets - Harvard
42,487
Towers
Net Income (Loss)
[56,821)
[9,660)
The content of the items listed as "Inventories: Construction in progress" and "Unimproved (vacant) lots" on the Beck *167 Homes balance sheets as of May 31, 1970 in the respective amounts of $ 143,268 and $ 32,809 are summarized by the following schedule: BECK HOMES CO., INC. Notes Payable Work in
Progress
Notes Payable
Job
Inventory
Original
No.
5/31/70
Amount
Detail
Total
Leslie Leigh 2nd
Add.-Tulsa
640
$ 13,822.30
$ 17,460.00
$ $ 8,730.00
681
14,499.03
55,000.00
11,000.00
675
13,087.36
683
13,142.60
684
11,467.39
704
12,485.75
30,000.00
30,000.00
629
17,497.65
11,261.47
11,261.47
978.16
978.16
690
11,888.99
( 8,970.00
693
11,869.08
(11,100.00
695
11,962.47
113,625.00
(10,950.00
660
11,545.84
2,770.20
Total
$ 143,268.46
(5,500.00)
698
$ 3,202.29
2,509.20
705
3,515.53
2,509.20
713
3,280.00
2,952.00
712
2,215.00
1,993.50
711
2,305.0 0
2,074.50
3,053.00
2,747.70
2,995.00
2,695.50
2,788.00
331,231.00
2,509.20
17,261.00
Midland Acres 6th
Add.-Tulsa
9,455.44
22,400.00
12,116.40
Total unimproved lots
$ 32,809.26
8,290.05
4,540.00
1,540.00
75,018.60
Sub-total
211,755.68
115,064.68
Total
$ 326.820.36
*168 Accrued
Job
Interest
No.
5/31/70
Payee
Security
Leslie Leigh 2nd
Add.-Tulsa
640
$ Guaranty Nat'l
mortgage dated
Bank
10/27/69
681
Chas. F. Curry Co.
Mortgage dated
11/1/68
675
683
684
704
600.00
First Nat'l Bank &
Mortgage dated
Trust Co.
4/2/70
629
600.64
McMichael Concrete
Mortgage dated
Co. 10/16/69
Tulsa Rock Co.
Mortgage dated
10/16/69
690
693
Lomas & Nettleton
Mortgage dated
4/2/69
695
660
Total
(Paid on contract)
698
705
713
712
711
6,316.77
Prince of Denmark,
Contract dated
Inc.
4/18/66
Midland Acres 6th
Add.-Tulsa
5,000.00
Tulsa Rig, Reel &
Mortgage dated
Mfg. Co.
10/13/65
Total unimproved lots
Hale Plumbing Co.
Unsecured
Nat'l Bank of
Unsecured
Commerce
F & M Bank
Chattel (Truck)
Mtg. dated 4/3/69
Tulsa Rig, Reel &
Personal
Mfg. Co.
endorsement and
mortgage on
Sub-total
personal real
estate of Fred
Frazier
Fred Frazier
Unsecured
Total
$ 12,517.41
Work in progress inventory items designated as Job No. 640 through 660 represented houses which were in various *169 stages of completion with the majority of such items completed and awaiting sale on May 31, 1970. Petitioner decided to commence liquidation of Beck Homes and Southside Cabinet in the early or middle part of 1969. He received his last salary check from Beck Homes in May 1969 and from Southside Cabinet in October 1969. The last home which Beck Homes constructed was commenced in May 1969 and the major part of the construction on a home was generally completed within 90 days. In September 1969, the vice president of Southside Cabinet, considered by petitioner to be its key man, terminated his employment with Southside Cabinet. On May 13, 1971 petitioner filed an application for refund of income tax for the taxable year 1969 based upon a tentative carryback adjustment for a net operating loss incurred in 1970 in the amount of $ 126,447.47. In his statutory notice of deficiency, the Commissioner determined that the transfer of the Harvard Towers to Beck Homes and Southside Cabinet was not at "arm's-length." Under the authority of section 482 to prevent the evasion of taxes and to clearly reflect income, the Commissioner allocated the $ 424,872 gain realized by Beck Homes and Southside *170 Cabinet to petitioner. He also determined that the $ 126,447.47 net operating loss should be reduced by $ 83,156.34 to $ 43,291.13 due, in part, to his recharacterization of the claimed $ 89,887.40 business bad debt as a contribution to capital rather than a loan or, alternatively, that it was a nonbusiness bad debt rather than business related. In addition, he allowed a deduction for the worthlessness of Beck Homes stock in 1970. Other adjustments to the claimed net operating loss deduction are not contested. OPINION HARVARD TOWERS TRANSFER
Respondent questions under section 482 petitioner's transfer of his one-half interest in Harvard Towers to his wholly owned corporations, Beck Homes and Southside Cabinet and seeks to attribute reported gain by the corporations of $ 424,872 to petitioner. In his own terms, "respondent has reallocated $ 424,872.00 to petitioners in order to reflect an arm's-length price on the transfer of petitioner's interest in Harvard Towers" on the grounds that "an unrelated party would not have transferred the Harvard Towers to another unrelated party in an arm's-length transaction for the price petitioner transferred the Harvard Towers." Respondent *171 relies on section 1.482-1(d)(4), Income Tax Regs., which provides in part: If the members of a group of controlled taxpayers engage in transactions with one another, the district director may distribute, apportion, or allocate income, deductions, credits, or allowances to reflect the true taxable income of the individual members under the standards set forth in this section and in sec. 1.482-2 notwithstanding the fact that the ultimate income anticipated from a series of transactions may not be realized or is realized during a later period. For example, if one member of a controlled group sells a product at less than an arm's length price to a second member of the group in one taxable year and the second member resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, notwithstanding that the second member of the group had not realized any gross income from the resale of the product in the first year. * * * On the other hand, petitioner relies on testimony and documentary proof to show that the transfer was a contribution to *172 the capital of Beck Homes and Southside Cabinet and the subsequent sale to Tulsa Rig was an arm's-length transaction. The burden of proof is on petitioner to show that the Commissioner did not abuse the discretion granted to him under section 482 to reallocate the gain from the sale of a one-half interest in Harvard Towers from the corporations to petitioner. The Commissioner must be sustained if the gain is properly allocable to petitioner regardless of the reasons. We may reverse his determination under section 482 only if it is unreasonable, arbitrary, or capricious. Grenada Industries, Inc.,17 T.C. 231, 255 (1951), affd. 202 F.2d 873 (5th Cir. 1953), cert. denied 346 U.S. 819 (1953). The Commissioner takes the position that section 482 applies because petitioner, in substance, sold Harvard Towers to his wholly owned corporations. We conclude that this is not the correct evaluation of the transactions which compel taxation of the gain to petitioners. Instead, we are more persuaded that petitioner, in effect, sold his interest in Harvard Towers direct to Tulsa Rig, individually, and used the proceeds as contributions to the capital *173 of Beck Homes and Southside Cabinet. We recognize the difficulty of a witness in recalling the precise time that events occurred several years in the past. When the timing of events is so crucial to an issue, and the time span during which they occurred is very limited such as here, it cannot be overlooked that the burden is on petitioner to pinpoint the timing of the events in order to dispel any strong, adverse inferences of cause and effect. In this regard, petitioners have fallen short of the necessary mark. Petitioner and witnesses for petitioners testified as follows as to the crucial dates: 1968 or 1969 - Tulsa Rig became aware of Beck Homes' insolvent position. 1968 or 1969 - Tulsa Rig terminated Beck Homes' line of credit at F & M Bank. Prior to August 29, 1969 - Petitioner discussed the tax consequences of the transaction with his attorney and accountant, both tax advisors. August 29, 1969 - Petitioner withdrew his interest in Harvard Towers from Baker-Frazier partnership. August 29, 1969 - Tulsa Rig lent $ 75,000 to Beck Homes with petitioner as guarantor. September 4, 1969 - Petitioner transferred his interest in Harvard Towers to Beck Homes and Southside *174 Cabinet. "Early" September 1969 - First discussion between Tulsa Rig and petitioner, in his capacity as a corporate officer concerning the use of Harvard Towers to aid Beck Homes' and Southside Cabinet's financial problems. October 1, 1969 - Beck Homes and Southside Cabinet sold their interest in Harvard Towers to Tulsa Rig. We find it difficult to understand why Tulsa Rig would advance Beck Homes $ 75,000 on August 29, 1969 after having cancelled its line of credit at F & M Bank even with the personal guaranty of petitioner unless Tulsa Rig had a substantial reason to believe that its indebtedness from Beck Homes would be repaid. We find it more plausible that petitioner contacted his attorney and accountant as to the tax consequences of the transfer of his interest in Harvard Towers after he had "felt out" Tulsa Rig on such a proposition. We conclude that petitioner's memory as to the time of his discussions with Tulsa Rig, vague at best, is inaccurate and we believe that it occurred before August 29, 1969. The only valuable asset owned by petitioner which could be used to "bail out" Beck Homes and Southside Cabinet was his one-half interest in Harvard Towers. We think petitioner *175 contacted officers of Tulsa Rig and they agreed that Tulsa Rig would acquire such interest to satisfy the Beck Homes indebtedness. Furthermore, we do not believe that Tulsa Rig would advance $ 75,000 to a corporation already directly indebted to it to the extent of $ 114,343.60 and potentially indebted under the line of credit to the extent of $ 220,858.03, without an understanding that Tulsa Rig would be purchasing petitioner's interest in Harvard Towers in the near future. After the understanding with Tulsa Rig, petitioner thereupon contacted his attorney and accountant to see how such a plan could best be accomplished tax-wise. They concluded that the losses of the corporations could be utilized to offset the gain, in part, from the sale to Tulsa Rig if petitioner contributed the Harvard Towers interest to the corporations in ratios of one-tenth and nine-tenths. No explanation was offered as to the ratios used except that they were, in general, based upon the ratio of the net operating losses of the corporations. On August 29, 1969, petitioner withdrew his one-half interest in Harvard Towers from the Frazier-Baker Properties' partnership and on the same date Tulsa Rig advanced *176 an additional $ 75,000 to Beck Homes. In substance, therefore, we find that petitioner sold his interest in Harvard Towers to Tulsa Rig. See Pauline W. Ach,42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966). Although not based upon section 482, factually, John E. Palmer,44 T.C. 92 (1965), affd. 354 F.2d 974 (1st Cir. 1965), is similar to the instant case. Our holding that the sale was, in substance, from petitioner to Tulsa Rig, compels a finding that none of the gain from the sale is subject to the provisions of section 1239, as contended by respondent. In the recomputation of tax under Rule 155, Tax Court Rules of Practice and Procedure, for the taxable year 1969, the $ 136,512.05 which petitioners reported as ordinary income will be treated as long-term capital gain. LOANS V. CONTRIBUTIONS TO CAPITAL
Petitioner advanced $ 60,000 to Beck Homes in 1965 and an additional $ 60,000 in 1968. The advances were not represented by promissory notes, nor was there any security for repayment, time for repayment nor provision for interest. On January 9, 1971, of the amounts advanced $ 82,387.40 remained to be repaid *177 to petitioner and petitioners deducted that sum on their joint return for the taxable year 1970 as a business bad debt. The Commissioner, in his statutory notice of deficiency, disallowed the deduction on the grounds that the advances represented contributions to capital but if they represented debt the loss was a nonbusiness bad debt. The burden is on petitioners to establish that the advances were in fact loans, National Farmers Union Service Corp. v. United States,400 F.2d 483 (10th Cir. 1968), and the determination is governed by economic substance and reality rather than form. McSorley's, Inc. v. United States,323 F.2d 900, 902 (10th Cir. 1963). An aggregation, comparison and weighing of the factors generally regarded as the differences between debt and equity guide our decision. Crawford Drug Stores v. United States,220 F.2d 292 (10th Cir. 1955); Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968); A. R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970). Petitioner's uncontroverted testimony discloses that he intended the transfers to be loans and that he expected *178 repayment. We must look beyond the subjective expressions of intent and determine whether objective manifestations support petitioner's subjective intent or a contrary conclusion. McSorley's, Inc. v. United States,supra.We do not agree with petitioners that the mere repayment of $ 37,612.60 of the $ 120,000 originally advanced clearly supports repayment of a loan because such a transfer is equally probative of a repayment of contributed capital. Likewise, the evidence demonstrates inconsistent treatment by Beck Homes of the advances and the inferences drawn therefrom are, accordingly, viewed as equivocal. Petitioner testified that in the past he made various loans to the corporations and they were repaid but no additional proof of such loans was offered, nor was any explanation offered as to why such evidence was not offered. Proof as to such prior advances would probably be unfavorable. Wichita Terminal Elevator Co.,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). On the other hand, respondent relies heavily on the lack of any formal evidence of indebtedness and the consequential absence of security, dates certain *179 for repayment of principal and provisions for interest. We do not question that a valid debt may exist between related parties without the formalities of a note, Malone & Hyde, Inc.,49 T.C. 575 (1968); Byerlite Corp.v. Williams,286 F.2d 285 (6th Cir. 1960), but in this instance we believe the attendant circumstances support a finding of capital contributions. Although petitioner points to the fact that Tulsa Rig extended a line of bank credit and lent $ 75,000 to Beck Homes on August 29, 1969, to verify that an unrelated investor dealing at arm's-length would have made loans similar to the two $ 60,000 advances in question, we find such facts unconvincing. National FarmersUnion Service Corp. v. United States,400 F.2d 483 (10th Cir. 1968); Tampa & Gulf Coast Railroad Co.,56 T.C. 1393 (1971), affd. per curiam 469 F.2d 263 (5th Cir. 1972). As explained above, we regard the $ 75,000 loan from Tulsa Rig with a jaundiced eye and do not regard Tulsa Rig as being a disinterested lender on August 29, 1969. Tulsa Rig was a large supplier of lumber to Beck Homes. It is true that extension of the line *180 of credit from Tulsa Rig coincided with the initial $ 60,000 advance by petitioner in 1965 but, as was stated in Cuyuna Realty Co. v. United States,382 F.2d 298, 301-302 (Ct. Cl. 1967), where the debtequity question was determinative of an interest deduction: A rule that the original intention of the parties should control the character of an instrument for all time would be completely inconsistent with the purpose of the statute. Interest, like an ordinary business expense, is allowed as a deduction from income because it is a cost of producing income. It ceases to be a real cost, if with the passage of time it becomes apparent that the parties have no intention of continuing the debtor-creditor relationship. We are concerned with the situation in which the continuance of the relationship is in question. Surely a parent's advance to a subsidiary may start out as bona fide indebtedness, and may continue as such into insolvency, but the character of indebtedness may vanish when the parent and the subsidiary cease acting like debtors and creditors; perhaps that point is passed when the parent, unlike the reasonable creditor, fails to force the subsidiary into bankruptcy. *181 As a prudent creditor, Tulsa Rig terminated its line of credit but petitioner, in seeking to satisfy all corporate debts prior to repayment of his advances, implicitly subordinated his rights and in so doing clearly placed recovery of the amounts transferred at the general risk of Beck Homes' operations. It is difficult to accept the argument that a prudent outside businessman would have allowed his debt to be accorded such treatment. Accordingly, we find that the $ 82,387.40 in unpaid advances were, in reality, equity capital and not deductible as worthless bad debts. YEAR OF STOCK WORTHLESSNESS
Petitioner claims that his stock investment in Beck Homes and Southside Cabinet became worthless in 1969. Petitioners bear the burden to establish loss due to worthlessness by identifiable events or occurrences. Boehm v. Commissioner,326 U.S. 287 (1945). Lambert v. Commissioner,108 F.2d 624 (10th Cir. 1939). The burden requires that the stock ceased to have both liquidating value and potential value. In balance sheet terms, the liabilities must have exceeded assets as of December 31, 1969, and there must not have been a reasonable expectation *182 that the value of the assets would exceed liabilities in the future. Nelson v.United States,131 F.2d 301 (8th Cir. 1942); Charles W.Steadman,50 T.C. 369 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). Petitioner relies extensively on the insolvent positions of Beck Homes and Southside Cabinet as set forth in the balance sheets buttressed by his testimony that he personally adopted and proceeded to implement a policy to terminate their affairs in 1969 to support his claim of worthlessness in 1969. Our examination centers around whether the activities pursued during and after late 1969 were in the nature of an attempt to salvage something for creditors, Steadman v. Commissioner,424 F.2d 1, 4 (6th Cir. 1970), affg. 50 T.C. 369 (1968), cert. denied 400 U.S. 869 (1970), in support of petitioner's self-serving expressions of an intent to terminate or whether such activities were so related to a continuation of general operations that they manifest reasonable expectations of future value in the stock. Boehm v. Commissioner,supra at 293. *183 There is no doubt that the mere cessation of business activities is not conclusive of worthlessness. Compare Royal Packing Co. v. Commissioner,22 F.2d 536 (9th Cir. 1927), with Benjamin v. Commissioner,70 F.2d 719 (2d Cir. 1934). Likewise, the continuation of business activities beyond the year of claimed worthlessness is not conclusive as to potential value. Compare Deeds v. Commissioner,47 F.2d 695 (6th Cir. 1931), with Frank C. Rand,40 B.T.A. 233 (1939), affd. 116 F.2d 929 (8th Cir. 1941), cert. denied 313 U.S. 594 (1941). As a general proposition, "[it] has been said that continuation in business is evidence of worth and that discontinuance of business indicates worthlessness." A. R. Jones Oil and Operating Co. v. Commissioner,114 F.2d 642, 645 (10th Cir. 1940). We believe the inferences drawn from the comparative income statements of Beck Homes support a finding that a concerted effort was made on the part of Beck Homes to wind up its affairs in 1969. We are not concerned here with speculative value such as mineral operations where an expected potential value *184 was sought through minimal exploratory operations. See Benjamin v. Commissioner,70 F.2d 719 (2d Cir. 1934), affg. B.T.A. Memo 1933-108. Also distinguishable is the manufacturing firm whose continued operations may be considered equivocal, Charles W. Steadman,50 T.C. 369, 382 (1968). Building permits for new housing starts on file with the City of Tulsa confirm that no new construction was commenced in 1970 by Beck Homes and the last building permit obtained by Beck Homes was on May 6, 1969. Although Beck Homes conducted some building activities in 1970, the amounts expended therefor were nominal, in comparison to prior years, and were directed toward incidental finishing work. We believe respondent errs in characterizing Beck Homes' activities in 1970 as "normal" business activities. The mere fact that Beck Homes' gross sales were $ 444,715 for the taxable year ending May 31, 1970 and $ 219,853 for the seven months ending December 31, 1970, does not clarify the intent underlying those activities. However, a comparison of such sales figures with the $ 915,925 figure for the taxable year ending May 31, 1969 tends to support petitioner's alleged adoption *185 and implementation of a plan of termination in 1969. With respect to the claimed insolvency of Beck Homes in 1969, we have closely scrutinized the balance sheets prepared by petitioner and, notwithstanding their lack of an "authoritative aura," see e.g., Mahler v. Commissioner,119 F.2d 869, 872 (2d Cir. 1941), we find their probative worth uncontroverted and sufficient to shift the burden of going forward to the respondent. B. F. Edwards,39 B.T.A. 735, 737-738 (1939). We find that Beck Homes had no liquidating value as of December 31, 1969, and its stock became worthless in 1969. Our remarks respecting the worthlessness of Beck Homes' stock in 1969 are equally applicable to our finding here that petitioners' stock in Southside Cabinet became worthless in 1969. In summary, we believe that any activities pursued by Southside Cabinet in 1970 represented the completion of commitments incurred prior to 1970 and were in accord with petitioner's adoption of and implementation of a plan to terminate Southside Cabinet's affairs in 1969. Upon excluding Southside Cabinet's liabilities to Beck Homes, we find that on November 30, 1969, liabilities exceeded *186 assets by $ 49,899. Coupled with this lack of a liquidating value in 1969, we find that Southside Cabinet's loss of its key operations man and its principal customer, Beck Homes, support the lack of potential value and a finding of worthlessness in 1969. $ 7,500 GUARANTOR PAYMENT IN 1970
On September 15, 1970, petitioner, as guarantor of the $ 75,000 Tulsa Rig loan to Beck Homes, made a payment to Tulsa Rig of $ 7,500. We have determined that Beck Homes' stock became worthless in 1969 and petitioner admits that at the time of the guaranty he did not expect Beck Homes to repay the loan. He contends that he made the guaranty to protect his business reputation and credit and that the repayment should, therefore, be deductible as a business bad debt or as an ordinary and necessary expense incident to carrying on his trade or business in real estate development, construction, management and sales. Sec. 162(a). The Commissioner's determination denied the deduction as a business bad debt and recharacterized the payment on the note as a contribution to the capital of Beck Homes. With respect to an advance not under a guaranty agreement: * * * if the debtor is not in existence at *187 the time of the payment or is so hopelessly insolvent as to preclude any expectation of reimbursement or where reimbursement of no more than a small percentage of the amount of the advancement may be expected, it is presumed that the payor is not lending the money and that no debt is created. Such a payment would either be a capital contribution, or an expense, depending upon the fact situation. Alleghany Corporation, 28 T.C. 298, 305 (1957); Putnam v. Commissioner, 352 U.S. 82 (1956). A problem arises, however, in the situation where one pays another's debts pursuant to a prior guaranty. At the time the guarantor is called upon to pay, the debtor presumably cannot pay and is many times insolvent, giving the guarantor little if any hope at that time of reimbursement. Therefore, application of the test of expectation of reimbursement as of the time of the actual payment would generally preclude classification of any such payments as debts and bring them all into the class of capital contributions if the circumstances do not support classification as a business expense. The courts, therefore, have determined the character of the payment pursuant to the guaranty *188 as of the time of the guaranty rather than the time of the payment. * * * [W. D. Roussel,37 T.C. 235, 242 (1961).] Petitioner did not expect Beck Homes to repay the loan and he therefore cannot now claim that the lack of repayment of the $ 7,500 created a bad debt. Hoyt v. Commissioner,145 F.2d 634 (2d Cir. 1944), affg. a Memorandum Opinion of this Court; Fred A.Bihlmaier,17 T.C. 620 (1951); E. J. Ellisberg,9 T.C. 463 (1947). We have found such payments to have been contributions to capital, Fred A. Bihlmaier,supra;C. M. Gooch Lumber Sales Co.,49 T.C. 649 (1968), remanded for entry of decision in accordance with compromise agreement of the parties, 406 F.2d 290 (6th Cir. 1969); Wilfred J. Funk,35 T.C. 42 (1960); Phil L. Hudson,31 T.C. 574 (1958), notwithstanding a determination that the corporate debtor's stock was worthless in a prior year. Reading Co. v. Commissioner,132 F.2d 306 (3d Cir. 1942), affg. a Memorandum Opinion of this Court. Respondent does not claim that the $ 7,500 payment was made *189 other than by virtue of a legally enforceable guaranty contract and the cases denying an ordinary and necessary expense on grounds that the payment was voluntary are therefore distinguishable. Robinson v. Commissioner,53 F.2d 810, 811 (8th Cir. 1931), affg. 18 B.T.A. 703 (1930); Putnam v.Commissioner,352 U.S. 82, 88, n.13 (1956); Friedman v.Delaney,171 F.2d 269 (1st Cir. 1948), cert. denied 336 U.S. 936 (1949); W. F. Young, Inc. v. Commissioner,120 F.2d 159 (1st Cir. 1941). Petitioner has shown that the payment of the guaranty was an ordinary and necessary expense in carrying on his real estate enterprises. Petitioner's numerous activities as an individual and in various real estate partnerships establish that his trade or business was clearly related to dealings in real estate and that he felt the necessity to protect his standing. This is amply demonstrated by his use of a valuable asset, Harvard Towers, to satisfy debts of wholly owned corporations for which he was not personally liable. With respect to the ordinary and necessary nature of the guaranty and payments, Allen v.Commissioner,283 F.2d 785 (7th Cir. 1960), *190 affg. in part, revg. and remanding in part a Memorandum Opinion of this Court, is controlling.[3] Although the taxpayer in Allen was not allowed to deduct advances to a corporation while it was in existence, he was allowed an ordinary and necessary deduction for advances after it was no longer active and was in the process of dissolution. Although he was not obligated to make the payments, as was petitioner here under the guaranty, the purpose of the payments were, as here, to protect the taxpayer's reputation and credit standing. An expense is "necessary" if it is appropriate and helpful in developing and maintaining a taxpayer's business. Welch v.Helvering,290 U.S. 111, 113 (1933). This burden is met by the uncontroverted testimony that petitioner's failure to make efforts to satisfy the corporate debts would have rather seriously damaged his credit reputation. Likewise, the guaranty of corporate loans in the real estate construction industry was a common occurrence. Deputy v. DuPont,308 U.S. 488, 495 (1940). The $ 7,500 payment by petitioner is, therefore, deductible. *191 Decision will be enteredunder Rule 155.
Footnotes
1. All Code section references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue, unless otherwise noted.↩
1. Income Statement for May 31, 1969, derived from corporate tax return where "Miscellaneous" items were aggregated.↩
3. In C. H. White,15 B.T.A. 1375↩ (1929), advances to a corporation at a time when it was hopelessly insolvent to aid in its dissolution by stockholders seeking to protect their names and to enable them to engage in the same business were found to be business losses.