T.C. Memo. 1996-293


UNITED STATES TAX COURT


WALLY FINDLAY GALLERIES INTERNATIONAL, INC. AND SUBSIDIARIES,
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15292-94.                    Filed June 24, 1996.


W's foreign subsidiary F was insolvent for many
years.  When economic instability greatly exacerbated
F's financial problems, W wrote off F's intercompany
debt and its investment in F's stock, but continued to
operate F for 3 more years in the hope that F could be
sold as a going concern or that its assets would
increase in value.  <u>Held</u>:  Deductions for bad debts and
worthless stock on the consolidated return of W's
affiliated group were properly disallowed.

<u>John J. Quinlisk</u>, <u>Anne Showel Quinn</u>, and <u>Patrick J. Bitterman</u>,
for petitioners.

<u>Russell D. Pinkerton</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioners sought redetermination of deficiencies in their Federal income tax for the taxable years ended September 30, 1981 (FY 1981) and September 30, 1982 (FY 1982) in the amounts of $620,347 and $85,612, respectively.  The deficiencies are attributable to the carryback of a net operating loss arising from two deductions claimed on petitioners' consolidated return for FY 1984.  We must decide:  (1) Whether petitioners are entitled to a deduction under section 166(a)(1)[1] with respect to accounts payable by a foreign subsidiary that were canceled in FY 1984; and (2) whether petitioners are entitled to a deduction under section 165(g) for loss of their investment in the foreign subsidiary.  We hold that neither deduction was proper.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference.  Petitioners are an affiliated group of corporations of which Wally Findlay Galleries International, Inc. (WFGI), is the parent.  At the time the petition was filed WFGI's principal office was located in Chicago, Illinois.  During FY

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

1981 through FY 1984 (taxable years at issue) WFGI was engaged in the acquisition and sale of works of fine art through art galleries located in New York City, Palm Beach, Chicago, Beverly Hills and Paris, France.  Operations in Paris were conducted in the form of a French limited liability company, Wally Findlay Galleries International, S.A.R.L. (French subsidiary), of which WFGI owned 99 percent and a domestic subsidiary owned the remaining 1 percent. The French subsidiary commenced operations in 1971.  The French subsidiary performed a number of functions for the corporate group (Wally Findlay Group).  It operated two Paris art galleries for exhibition and sale of paintings from WFGI's inventory.  The advantages of the Paris location and a series of highly celebrated exhibitions in the early years served to enhance WFGI's international reputation.  The French subsidiary also served as the international buying office for the Wally Findlay Group.  The WFGI annual report for the first year of the French subsidiary's operations explained the benefits expected from this arrangement:

> Working from this office in the midst of the European art market, our ability to acquire important French Impressionist and Post-impressionist paintings, a vital factor in our sales, has been greatly improved.  At the same time, our contacts with contemporary artists have been expanded.  For the first time, we are in a position to work closely year-round with the European based artists whom we represent exclusively and to review new artists.  This makes it possible to control our inventory and to schedule a more far-reaching program of exhibitions for all our galleries.

The French subsidiary also handled shipping and customs clearance for paintings acquired in Europe for the U.S. art galleries.  Although a resident manager oversaw operations, all major decisions concerning the French subsidiary were made by the officers of WFGI.

The principal asset of the French subsidiary was a long-term lease for the premises it used for its business.  The premises comprised a handsome 18th-century townhouse at 2, Avenue Matignon, and space in the basement and first floor of an adjoining building at 48, Avenue Gabriel.  The leased property was located in a prestigious district of the city and enjoyed high security owing to the proximity of the French president's residence.  Although the stated term of the lease was 9 years, owing to restrictions under French law on the landlord's ability to withhold his consent to renewal, it was effectively renewable indefinitely at the lessee's option.  The rent was adjusted once in every 3-year period, or trimester, according to a statutory formula based on the cost of living.  Presumably because of legal restrictions on the rental market, the fair-rental value of desirable commercial space in Paris tended substantially to exceed the rent.  Thus, to acquire its premium lease in 1969, the French subsidiary paid the prior tenant FF 1,445,250, or $262,773 at the then-current exchange rate of 5.5 francs per U.S. dollar. The French subsidiary made extensive renovations and structural

improvements to the property at great expense. These investments would likely have enhanced the premium value of the lease. Not long after the opening of its gallery at the Avenue Matignon address, the French subsidiary entered into a second lease for the use of display space in the Hotel George V. The record does not disclose the terms of this lease or the amount of any costs that the French subsidiary may have incurred for acquisition or improvements.

Most of the paintings offered for sale at the Paris gallery had been acquired from WFGI on consignment. During the years at issue, when one of these paintings was sold, the parent would record a sale of the painting to the subsidiary at 65 percent of the net retail price, and the subsidiary would record this amount as its cost for the painting. Amounts due WFGI on account of the subsidiary's sales were payable in U.S. dollars translated at the exchange rate prevailing at the time of sale. On the other hand, amounts earned by the subsidiary as commissions for purchasing, shipping, and export services on behalf of the parent were payable in francs. The cost of sales account payable to the parent and the commissions account payable to the subsidiary were the two major components of the overall intercompany account during the years at issue.

No promissory notes were executed to evidence indebtedness on the intercompany account. There was no stated maturity date,

no interest accrued, and no security was provided.  Under the memorandum of agreement executed in 1971, which governed their relationship, the subsidiary was required to remit amounts payable to the parent "as promptly as practicable."  In practice, WFGI permitted the French subsidiary to retain WFGI's 65-percent share of sale proceeds to pay other creditors and finance its working capital needs generally.  Although the French subsidiary made payments from time to time, the intercompany account showed a substantial balance due WFGI in every year from FY 1971 to FY 1984.

### Intercompany Account Balance Payable to WFGI

| FY | Balance | FY | Balance | FY | Balance |
|----|---------|----|---------|----|---------|
| 1971 | $1,179,903 | 1976 | $354,165 | 1981 | $885,013 |
| 1972 | 629,622 | 1977 | 453,777 | 1982 | 630,466 |
| 1973 | 991,735 | 1978 | 348,369 | 1983 | 1,026,143 |
| 1974 | 890,779 | 1979 | 286,419 | 1984 | [1]1,061,425 |
| 1975 | 707,021 | 1980 | 990,982 | | |

[1]Prior to cancellation as of September 30, 1984.

Owing to the large and persistent intercompany debt, the French subsidiary's balance sheets showed a deficit in shareholder's equity in every one of these years as well. Consequently, to have caused the subsidiary to pay greater amounts to the parent would have jeopardized the subsidiary's ability to continue paying its debts to third parties.  The officers of WFGI believe that any action by the parent company that caused the subsidiary's insolvency to become publicly known

would seriously injure the reputation of the Wally Findlay Group as a whole.

The French subsidiary suffered from a chronic insufficiency of earnings.  Between FY 1971 and FY 1984, the business was profitable in only 2 years, FY 1973 and FY 1980.  The success achieved in the latter year was, in large part, attributable to the patronage of Arab customers looking for ways to invest the large cash balances that had been generated by a sharp rise in oil prices.  The emergence of this new clientele was cause for optimism:  WFGI's officer's hoped that the French subsidiary would finally be able to sustain itself.  But the high oil prices proved unsustainable and Arab demand did not fulfill expectations.  After FY 1980 sales were uneven.

### Sales by the French Subsidiary

| FY | FF |
|------|-------------|
| 1980 | 10,878,545 |
| 1981 | 10,195,912 |
| 1982 | 6,849,060 |
| 1983 | 11,574,743 |
| 1984 | 6,177,305 |

The pattern of losses resumed in FY 1981.  In FY 1982 the subsidiary reported the largest loss in its history.  The subsidiary's accountants advised WFGI that in view of the large loss experienced in FY 1982 it seemed unlikely that the deficit in shareholder's equity would be eliminated in the next 2 years, and warned that under these circumstances they were required by

French law to notify the French authorities of the company's financial situation, which could result in a judicial declaration of insolvency and involuntary liquidation proceedings. They recommended that WFGI capitalize the intercompany account in order to cure the deficit.

Sales recovered in the next fiscal year, exceeding the level attained in FY 1980. Nevertheless, the French subsidiary reported another large loss. The consolidated financial statements of the group for FY 1981 through FY 1983 attributed 40 percent of the cumulative losses sustained by the French subsidiary during this period to losses in currency exchange transactions caused by the appreciation of the U.S. dollar against the franc.

A series of events in FY 1984 compounded the French subsidiary's problems. For many years the company's accounts at Banque de la Cite had been continuously overdrawn. The bank had honored overdrafts, charging interest on the funds beginning in 1982. In February 1984 the French subsidiary was asked to transfer a Rouault painting from its collection to the bank as security. In March the bank announced that it would no longer honor checks drawn on the subsidiary's accounts without a guarantee from the parent. WFGI acceded to the bank's demand, arranging for its own bank in the United States to issue a letter of credit on behalf of the French subsidiary.

In July 1984 the subsidiary's accountants discovered that FF 108,000 (approximately $11,000 - $12,000 at then-current exchange rates) attributable to cash transactions was missing. WFGI's officers concluded that the funds had been embezzled by the subsidiary's resident manager. The money was never recovered. The manager left the company before the end of the fiscal year, pursuant to a settlement agreement involving a mutual release of claims and an additional payment by WFGI of $22,000.

In July an artist doing business as Selene Ltd. filed suit against the French subsidiary, seeking payment of $25,500 allegedly due to him as his share of the sale price of two paintings. Having investigated the financial capacity of the subsidiary and learned that it was technically insolvent, he requested a declaration of insolvency and involuntary liquidation of the company to satisfy his claim.

As the fiscal yearend approached, the officers of WFGI expected that the results for the year would again show a large loss. Moreover, despite payments to the parent by the subsidiary during the years at issue totaling more than $1.5 million, the intercompany account balance had reached its highest level since the first year of operation. A special meeting was convened on September 20, 1984, to consider the possibility of dissolving the French subsidiary. For reasons that are not clearly articulated

in the minutes, it was decided that the subsidiary should
continue business in spite of its losses.  In October the
officers of WFGI traveled to Paris, where they discussed the
French subsidiary's situation with its accountants and legal
counsel.  Upon their return, acting in their capacity as the
executive committee of the board of directors of WFGI, they
adopted a resolution canceling the outstanding indebtedness of
the French subsidiary reflected in the intercompany account as of
September 30, 1984, $1,061,425. The resolution was made
retroactive to the last day of FY 1984.  In support of their
action, they cited the subsidiary's disappointing sales during
the year and its present insolvency; the parent's intervention to
maintain the subsidiary's line of credit at Banque de la Cite;
the defalcations of the local manager; the warnings they had
received from the subsidiary's accountants and counsel that its
capital must be increased in order to avert involuntary
liquidation under French law; and the threat that Selene's
lawsuit would lead to insolvency proceedings.  They concluded:

> the French Subsidiary is not now able to pay its
> indebtedness to its parent corporation, * * * that
> there is no basis for believing that such indebtedness
> will be paid within the foreseeable future, and that
> the only realistic way to deal with the potential
> problems regarding other creditors and with the French
> Government is for the French Subsidiary's indebtedness
> to the parent corporation to be cancelled.

The subsidiary's financial statements for FY 1984 were
available by December 1984.  They showed a heavy loss for the

year before taking income from discharge of indebtedness into account. Foreign exchange losses were again a substantial component. The financial statements also showed that the company was technically insolvent by $26,228 even after cancellation of the intercompany debt. In no previous year had liabilities to third parties exceeded assets. In March 1985 WFGI received the results of an "accrual review" performed by its accountants to determine an appropriate provision for taxes on the consolidated financial statements for FY 1984. In the opinion of the accountants, after cancellation of the intercompany debt the subsidiary remained insolvent on a "fair market value liquidation basis" as of September 30, 1984. In other words, if the assets were sold at their fair market value, the amount realized would not be sufficient to satisfy the remaining debts to third parties. There is no indication that an independent appraisal was performed to ascertain the fair market value of the assets. Rather, the result turned on a determination that the book value of the assets was not likely to understate their fair market value by more than the "couple hundred thousand dollars" of additional liabilities for administrative and legal costs, severance payments, Social Security, taxes and the like, that would be incurred in a liquidation. The conclusion of the accrual review was that it would be reasonable for tax purposes

to treat both the intercompany debt and the stock of the French subsidiary as wholly worthless as of the close of FY 1984.

On their consolidated U.S. Corporation Income Tax Return for FY 1984, filed June 20, 1985, petitioners claimed a deduction in the amount of $1,663,237, consisting of the balance of the intercompany account ($1,061,425) and the basis in the French subsidiary's stock ($601,812) on September 30, 1984. The amount written off as a bad debt had been accrued as receipts by WFGI and included in consolidated income in prior years. The French subsidiary reported income from discharge of indebtedness on its French income tax return. This income was fully offset by prior net operating losses and created no tax liability.

Notwithstanding their determination that the French subsidiary was hopelessly insolvent, its stock worthless and the intercompany account uncollectible, the officers of WFGI adhered to their decision to keep the subsidiary operating after FY 1984. For the most part, intercompany business continued as usual. The subsidiary continued to sell paintings on consignment from WFGI, and the intercompany account, once again, showed an increasing balance owed to the parent. The officers of WFGI considered ways to reduce the subsidiary's expenses and hoped that the new intercompany debt would be repaid out of higher sales. There is evidence that WFGI did not expect this relationship would continue indefinitely and intended to limit its support. In

March 1985 it declined to provide the required annual certification to the French government that it would support the capital of its subsidiary. As a result, under French law the subsidiary would automatically liquidate after 2 years. When the letter of credit furnished to Banque de la Cite expired in July 1985, WFGI did not renew it.

There were a number of reasons why WFGI chose not to terminate the subsidiary, even at the risk of continued losses. During and after FY 1984 the officers of WFGI were actively soliciting offers for the purchase of the French subsidiary, either alone or as a part of the entire Wally Findlay Group. They evidently continued to believe that the French subsidiary contributed to the market value of the group, and they received expressions of interest in the French subsidiary from some prospective buyers. It would not have made sense to liquidate the subsidiary so long as selling it as a going concern was a realistic possibility. On the other hand, if the subsidiary were to be liquidated, the amount that could be realized from assignment of the premium lease immediately after FY 1984 would probably be less than its potential value. In the fall of 1984 the lease was in the third trimester of its second 9-year term. Whoever held the lease thereafter would have to renegotiate it on or before June 30, 1987, when the term expired. WFGI had been advised by French counsel that a third party who acquired the

lease from the French subsidiary in its third trimester would not be able to renew on terms as favorable as the French subsidiary itself could expect. Consequently, if the subsidiary attempted to assign the lease before renegotiating it, no assignee would be willing to pay as much for the lease as the opportunity cost to the Wally Findlay Group of surrendering it. Another reason to delay any assignment of the lease was that the French subsidiary was involved in a dispute over the rights to certain areas in the Avenue Gabriel building. Another tenant was using the disputed areas for its restaurant. The results of an investigation by a court-appointed expert in 1983 had supported the French subsidiary's claim and prospects for regaining possession were good, but until the litigation was concluded or settled the marketability of the lease was impaired.

By the end of FY 1987 the officers of WFGI had not found a buyer for the group as a whole or for the French subsidiary separately. The subsidiary renewed the lease for a third term and then disposed of it. In a complex multiparty transaction, two-thirds of the premises were assigned by the subsidiary to a Frenchman named Mr. Leadouze, and the other one-third was assigned to WFGI. Mr. Leadouze paid FF 1.3 million for the portion of the leasehold that he received. WFGI acquired its portion of the leasehold at a cost of $253,461. The French subsidiary ceased operations during FY 1987, a liquidator was

appointed in October 1987, and liquidation procedures were completed by 1990.  WFGI continued to use the premises for a purchasing office until 1995.  At the time of trial, it still retained the lease.

OPINION

1. Bad Debt

A deduction is allowed for a debt that becomes worthless during the taxable year.  Sec. 166(a)(1).[2]  A debt is worthless when there is no longer any reasonable expectation of recovery. Dallmeyer v. Commissioner, 14 T.C. 1282, 1292 (1950); Tejon Ranch Co. v. Commissioner, T.C. Memo. 1985-207; Ruane v. Commissioner, T.C. Memo. 1958-175.  Because the determination of worthlessness calls for the exercise of business judgment, courts have tested the taxpayer's determination for the elements of sound business judgment: consistency, the use of all available information, and the reasonableness of the inferences drawn from the information. See, e.g., Riss v. Commissioner, 478 F.2d 1160, 1166 (8th Cir. 1973), affg. in part 56 T.C. 388 (1971); Minneapolis, St. Paul & Sault Ste. Marie R.R. Co. v. United States, 164 Ct. Cl. 226 (1964); Production Steel Inc. v. Commissioner, T.C. Memo. 1979-361.  Only bona fide indebtedness can give rise to a deduction

---

[2] The authority of the Secretary to allow a deduction for debts that are only recoverable in part is not at issue in this case.  See sec. 166(a)(2).

under section 166.  <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. 476, 493 (1980); sec. 1.166-1(c), Income Tax Regs.  Petitioners bear the burden of proof on all issues.  Rule 142(a).

In her notice of deficiency, respondent disallowed petitioners' deduction of the intercompany account balance in FY 1984 on the grounds that either (1) the amounts reflected in this account were contributions to capital rather than debts, or, alternatively, (2) if they were bona fide debts, they did not become worthless during FY 1984.  Because we sustain respondent's determination on the alternative ground that petitioners have not shown that any debt evidenced by such amounts became worthless during the relevant tax year, we need not reach the question of the true character of the amounts at issue.  For purposes of this Opinion, we shall assume that they were debts.

Petitioners defend the determination of the officers of WFGI that the intercompany debt was worthless largely for the same reasons that the officers cited in support of it at the time.  We are not persuaded that those reasons prove that the debt became worthless during FY 1984.  They are marred by inconsistencies, questionable inferences, and failure to use available information of obvious importance.

In order to establish that the intercompany debt was worthless, petitioners must prove that no portion of it was reasonably recoverable.  The excess of other liabilities over

assets shown on the balance sheet for FY 1984 was $26,228. To the extent that the balance sheet may have understated the amount that could be realized upon the sale of the subsidiary or its assets by more than $26,228, a portion of the intercompany debt could have been recoverable.

WFGI's auditors opined that in the event that the French subsidiary had been liquidated at the end of FY 1984, it would have incurred additional liquidation liabilities of approximately $200,000. Assuming this estimate to be correct, any understatement of asset values on the balance sheet would have to have been very large in order for sale of the subsidiary's assets at the end of FY 1984 to have yielded enough to repay any of the intercompany debt. Prompt liquidation, however, was only one of the scenarios contemplated by WFGI's officers at the time, and the least desirable. During and after FY 1984 they were actively promoting the sale of the French subsidiary or the group as a whole. There was sufficient expression of interest from prospective buyers to support a reasonable expectation that liquidation could be avoided. To have assumed that the additional liabilities estimated by their auditors were inevitable would not have been consistent with the expectations driving the marketing efforts.

There are reasons to question whether the financial statements accurately reflect the capacity of the French

subsidiary to repay the parent's advances.  Not all the assets of the French subsidiary were stated on the balance sheet.  Where a business is sold as a going concern, there may be intangible assets such as goodwill that enhance its value to the purchaser. In a document apparently prepared for prospective buyers dated January 1985, the value of the Wally Findlay Group is stated as $41 million, of which approximately $11 million is accounted for as "Trademark - Name Goodwill - etc."  In addition, an unspecified amount of "goodwill" is included in the value assigned to the New York gallery.  Petitioners argue that none of the approximately $11 million intangible value of the group is attributable to the French subsidiary because ownership of the tradename was held by the parent.  If this logic were sound, then presumably no goodwill would properly be attributable to the New York gallery either.  But there is reason to believe that the French subsidiary contributed to the intangible value of the group.  Another promotional brochure entitled "Wally Findlay Galleries International, SARL", dated April 1986, contains information believed to be of interest to prospective purchasers of the "first important American gallery in Paris".  After describing the inaugural exhibition in 1971, the brochure summarizes achievements since that time:

> This was the first of many spectacular gala openings attended by European royalty, the most socially prominent Parisians and internationally known collectors. * * *

A few of the many important names often associated with the gallery in the press and magazine articles are the Duke and Duchess of Bedford, Prince Ranier and the late Princess Grace of Monaco, the Duke and Duchess d'Orleans, Baron and Baroness David de Rothschild, * * *.

These openings and the enthusiastic review of them have made Wally Findlay Galleries, Paris, widely known in Europe.  In turn, this international recognition, added to the longer established dominance of Wally Findlay Galleries in America, has made Wally Findlay Galleries a unique organization in the art world.

Soon after the opening of the gallery at 2, Avenue Matignon, the second Wally Findlay Galleries operation in Paris was established at the George V Hotel.  Here rotating exhibitions have provided additional exposure for our contemporary artists and have resulted in developing important new partrons [sic] from the constant flow of distinguished visitors to this elegant hotel.

*       *       *       *       *       *       *

A number of years ago an art gallery was opened in Jeddah, Saudi Arabia.  From this gallery's inception, Wally Findlay Galleries, Paris, has been one of its principal suppliers of paintings.

This description was composed at a time when, for purposes of this litigation, petitioners maintain that the French subsidiary had long since ceased to contribute any value to the Wally Findlay Group.  Even if we grant that the purpose of this material is to excite an investor's interest, the portrait it provides is difficult to reconcile with petitioners' contention that none of the substantial goodwill of the group was attributable to the French subsidiary.  The fact that WFGI

prolonged the French subsidiary's existence until 1987, then took over its facilities and continued to use them for some of the same functions for 8 more years, testifies to the importance that WFGI attached to the image and customer relations that were associated with the Paris operations.

The assets of the French subsidiary were stated on the balance sheet at their book value. Although fair market value is clearly the more appropriate index, there appears to have been no attempt to appraise them. The discrepancy between book value and fair market value was likely to be most significant in the case of the long-term lease. The balance sheet for FY 1984 states its value as $155,671. This represents the original cost to acquire the lease, FF 1,445,250, translated into U.S. dollars at the exchange rate prevailing on September 30, 1984. It does not reflect the considerable costs incurred to improve the property. The book value of the improvements at this time, adjusted for depreciation over nearly 15 years, was still $360,693.

Promotional material, dated January 1985, states the value of the French subsidiary's leasehold rights as $250,000. Petitioners now disavow this estimate as puffery. They contend that because the lease was in its third trimester and possession of a portion of the premises was in dispute as of the end of FY 1984, the market value would have been substantially impaired. We find this argument unconvincing. Inasmuch as the officers of

WFGI intended to retain the lease until these obstacles to marketability were removed, the potential value of the lease under the more favorable conditions that were expected seems to be the more appropriate measure for purposes of this case than the amount that could be realized by assigning it at the end of FY 1984.

The $250,000 estimate may well have been closer to the potential market value of the lease than its book value. The total amount that WFGI and a French individual paid for the lease 3 years later, translated into U.S. dollars at the exchange rate prevailing at the end of FY 1984, was $307,653.[3]

---

[3] The lease for one-third of the premises was acquired by WFGI at a cost of $253,461, or FF 1,556,251 at the current exchange rate on Sept. 30, 1987. The lease for the other two-thirds was assigned to a French individual for FF 1.3 million. The total premium paid for the lease of the premises by both parties was FF 2,856,251, which at the exchange rate prevailing on Sept. 30, 1984 would equal $307,653. WFGI acquired its lease in two parts, one part from the French subsidiary and one part from a company referred to in the stipulations as "Elysee Matignon (the real estate management company)." This appears to be the same company that the French subsidiary had sued to recover possession of space that had been appropriated for the use of a restaurant. If the space that WFGI paid this company to acquire in the complicated multiparty transaction corresponded to the portion of the original leasehold that was in dispute, or other space exchanged for that portion in a settlement of the dispute, then $307,653 may be an overstatement of the amount that the French subsidiary could have expected to receive upon the assignment of its lease at the end of FY 1984. If the amount that WFGI paid to Elysee Matignon is not taken into account, however, the total lease premium would still amount to $243,026 at the Sept. 30, 1984 exchange rate.

Another serious weakness in petitioners' defense of the deduction lies in the failure to take account of the important effects of the exchange rate, both in the diagnosis of the French subsidiary's financial difficulties during the years at issue and in the forecast of its capacity to repay the debt thereafter.  On the balance sheets of the French subsidiary asset values were converted into U.S. dollars at the current exchange rates as of the fiscal yearend.  Although most of the subsidiary's liabilities were denominated in francs, the cost of sales reflected in the intercompany account, which constituted by far the largest liability, was fixed in U.S. dollars at the time of sale.  As a result, the value of assets, and shareholder's equity, exhibited a high degree of sensitivity to changes in the value of the franc vis-a-vis the U.S. dollar.  Between 1981 and 1985 the U.S. dollar rose dramatically against the franc, as well as against most other major currencies.  This depressed the U.S. dollar value of the French subsidiary's assets and its equity. The effect on the book value of the premium lease is particularly noteworthy.  The balance sheet for FY 1984 reports the book value of the lease as $155,671, using an exchange rate of 9.284 FF per U.S. dollar.  The rates used in preparation of the subsidiary's balance sheets during the 5-year period FY 1977-81, before the tremendous appreciation of the U.S. dollar, were in the range of 4.0 to 5.5.  At a rate of 5.0, the book value of the

lease would have been $289,050. If at the end of FY 1984 WFGI's officers had believed the lease to be worth about $250,000 at current exchange rates and they had correctly predicted the level of exchange rates as of September 30, 1987, when the lease was ultimately assigned, they would have expected the disposition of the lease to yield $378,000; if they had anticipated that the exchange rate would return to its historic levels, they would have expected approximately $100,000 more ($464,200 at 5.0 FF per U.S. dollar).

Exchange rates also affected the French subsidiary's ability to repay the intercompany debts out of current cash flows. According to the consolidated financial statements for the Wally Findlay Group, the French subsidiary's cumulative loss on currency exchange transactions between FY 1981 and FY 1984 was $562,000, a loss of repayment capacity corresponding to more than half of the intercompany account balance by the end of FY 1984. At the rate of exchange prevailing at that time, to pay off this balance required FF 9,854,270. If the franc returned to a level of 5.0, only FF 5,307,125 would have been needed. These numerical exercises are intended only to suggest how important exchange rate expectations would have been for a reasonable determination of the collectibility of the intercompany debt.

There is no evidence that the officers of WFGI incorporated any explicit exchange rate forecast into their assessment of the

French subsidiary's prospects. This had the same effect as an assumption that the franc would not recover significantly against the dollar in the foreseeable future. The record does not disclose the reasons why they may have discounted this possibility nor that they considered it at all. Petitioners have made no attempt to defend this assumption. In retrospect, of course, we know it to be incorrect. It may be that the peaking and steep decline of the U.S. dollar, beginning in 1985, could not reasonably have been anticipated on the basis of information available to the officers of WFGI at the time they decided to write off the intercompany debt. The point is not that they lacked perfect foresight, but that they seem to have neglected to make a reasoned forecast.

They were not unaware of the powerful effect of exchange rate instability on the subsidiary's finances. During the years at issue, the losses that the French subsidiary sustained on currency exchange transactions were duly noted by the subsidiary's auditors and reported in the consolidated financial statements. Promotional material prepared for investors blamed the subsidiary's financial difficulties on "the french economic situation and of [sic] losses on rates of exchange". Yet, the officers' analysis of the subsidiary's situation for tax purposes made no mention of the influence of exchange rates, a factor deserving attention in the exercise of sound business judgment.

This omission detracts from the officers' conclusion that the intercompany debt was worthless.

The succession of untoward events during FY 1984 that the officers of WFGI identified to justify their decision is not compelling. The actions of Banque de la Cite confirm that the French subsidiary's position had seriously deteriorated. But the bank would have acted to protect itself as soon as doubt arose that its loans would be repaid in full. It does not follow that the French subsidiary was unable to repay any portion of its debts. The misappropriated funds uncovered in July 1984 do not appear to have had a substantial impact on the company's finances. The Selene lawsuit and the advice that WFGI's officers received from the auditors of the subsidiary concerning the consequences of noncompliance with French capital requirements seem to have played a significant role in the decision to cancel the debt. But WFGI's willingness to cancel the debt in order to avert the damage to its reputation that would result from involuntary insolvency proceedings does not prove that the debt was totally worthless.

The circumstances that confronted WFGI in FY 1984 might have provided sufficient cause to cancel the intercompany debt even if WFGI could reasonably have expected to recover some of it. At that time elimination or capitalization of the intercompany debt may well have seemed imminent in any case, as a necessary part of

a sale of the group or of the French subsidiary alone.[4]  In the circumstances, we do not give dispositive effect to the officers' conclusion that the debt should be written off as worthless. Petitioners have failed to make the showing required in order to qualify for the deduction under section 166.

2. Worthless Stock

Section 165(g) provides for a deduction of the loss that results when stock becomes worthless during the taxable year. To establish worthlessness, the taxpayer must show not only current balance sheet insolvency, but also the absence of any reasonable expectation that the assets of the corporation will exceed its liabilities in the future.  Both liquidating value and potential value are relevant in this context.  Steadman v. Commissioner, 50 T.C. 369, 376-377 (1968), affd. 424 F.2d 1 (6th Cir. 1970); Morton v. Commissioner, 38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940).

Respondent disallowed the deduction under section 165(g) on the ground that petitioners had not shown that the stock of the French subsidiary became worthless in FY 1984.  We agree.  So long as intercompany indebtedness of more than $1 million remained on the subsidiary's balance sheet, the extent of balance

---

[4] When WFGI sold the stock of its Beverly Hills and New York galleries in 1980, it capitalized the subsidiaries' intercompany account debts.

sheet insolvency was so great that there may well have been no reasonable expectation that a continuation of the business would provide the parent with a return of its investment.  Cf. Morton v. Commissioner, supra at 1279.  Yet once the intercompany debt was forgiven, the balance sheet for FY 1984 showed a deficit in shareholder's equity of only $26,228, and the same considerations that would have supported a reasonable expectation of recovering part of the intercompany debt preclude a determination that the stock was worthless.

As internal corporate documents of WFGI reflect, the primary purpose of canceling the intercompany debt was "to get the capital structure back into compliance with French law" and avert the threat of involuntary insolvency proceedings.  WFGI's officers would not have forgiven the subsidiary's debt if they did not believe that this would provide meaningful support to its

capital.  The evidence suggests that in this belief they were justified.  We find that petitioners have not proven that the stock of the French subsidiary became worthless during FY 1984. To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.